# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re:

WASTE2ENERGY HOLDINGS, INC.,

Proposed Debtor.

Chapter 11

Case No. 11-12504 (KJC)

Hearing Date: To Be Determined by the Court – Shortened Notice Requested
Objection Deadline: To Be Determined by the Court – Shortened Notice Requested

## EMERGENCY MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(1) AND 1104(A)(2)

Luppino Landscaping & Masonry, LLC, Andrew John Savage, William Paul Simmelink, and Steven Benkovsky (collectively, the "Petitioning Creditors") move pursuant to 11 U.S.C. §§ 1104(a)(1) and 1104(a)(2) and Rule 2007 of the Federal Rules of Bankruptcy Procedure for an order appointing an operating chapter 11 trustee for the involuntary debtor, Waste2Energy Holdings, Inc. ("W2E").

## PRELIMINARY STATEMENT

1. The actions of W2E's current management present a sorry tale of incompetence, avarice, and betrayal of W2E, its creditors, and its investors. Christopher d'Arnaud Taylor, W2E's Chairman, and his long-time crony, Joseph Murphy, who started with W2E as a so-called "consultant" and is now its Chief Executive Officer, have taken a promising company with patents and other intellectual property for producing green energy and have grossly mismanaged it for their own personal aggrandizement.

{00114625.DOC; 12}

2. Taylor and Murphy's management of W2E's business and operation has been neither prudent nor reasonable. Most recently, they inexplicably abandoned a contract with W2E's only legitimate commercial partner, Waste to Energy Canada, Inc. ("WTEC"),[1] exposing W2E to potential liability of $500 million, if not more. The transaction with WTEC would have solved W2E's near-term liquidity problems, provided sufficient revenues to pay W2E's creditors in full, and allowed W2E to exploit its patents for producing energy through the gasification of solid waste. Instead, Taylor and Murphy would cause one of W2E's subsidiaries to breach written agreements with WTEC by entering into an exclusivity arrangement with a UK company and licensing various patents and other intellectual property to an unnamed Chinese company for the construction of waste-to-energy plants. Despite repeated requests from the creditors and shareholders, Taylor and Murphy have provided no details of this new plan. For reasons of their own, Taylor and Murphy would substitute an actual contract with a substantial company ready, willing, and able to perform with a nebulous outline of an undefined transaction with an unknown offshore entity.

3. Taylor and Murphy's mismanagement of W2E also includes ignoring the Securities Laws of the United States. W2E has not filed a Form 10-Q with the SEC since the second quarter of 2010 and has not filed a Form 10-K for the fiscal year ending March 31, 2011. The SEC's demand that these failures be cured has been ignored, and W2E's investors remain in the dark as to W2E's financial and business performance.

4. Taylor and Murphy have used corporate funds to pay for substantial personal expenses. They also have caused W2E to transfer the rights to its intellectual property to an

---

[1] Despite the similarity of name, there is no affiliation between WTEC and W2E.

offshore, Isle of Man subsidiary, against which Taylor and Murphy are first-position creditors by virtue of lavish "consulting agreements."

5. Despite being a publicly-traded company, W2E has never held a meeting of shareholders, at which shareholders could demand that Taylor and Murphy address their mismanagement of W2E; their use of corporate funds for their personal benefit instead of, for example, filing SEC required disclosures; the alienation of W2E's primary assets (i.e. the intellectual property) to foreign companies in which they are creditors that enjoy structural priority; and W2E's distressed financial state. The Petitioning Creditors have been unable to obtain from either Taylor or Murphy answers to questions about W2E. For example, Taylor and Murphy have never disclosed how W2E, under their stewardship, squandered $20 million of capital raised through a private placement; how W2E will be able to repay the defaulted debt instruments held by the Petitioning Creditors and other similarly situated creditors, and why W2E has abandoned the only apparent path to recovery through WTEC.

6. The Petitioning Creditors have absolutely no confidence in Taylor's and Murphy's ability to manage W2E for the benefit or creditors or shareholders. To protect further immediate and material harm to the interests of W2E's equity holders, its creditors, and W2E itself, Taylor and Murphy must be removed post haste from management and replaced by a disinterested trustee.

### THE PETITIONING CREDITORS

7. Luppino Landscaping & Masonry, LLC ("Luppino Landscaping") owns 1,350,000 shares of W2E's issued and outstanding common stock and warrants to purchase up to an additional 25,000 shares. Declaration of Carmelo Luppino, dated August 8, 2011

("Luppino Decl.") ¶¶ 2-5. Luppino Landscaping also owns W2E's Senior Convertible Debentures in the principal amount of $750,000. *Luppinio Decl.* ¶¶ 6-9.

8. Andrew John Savage owns 500,000 shares of W2E's issued and outstanding common stock. Savage also owns W2E's Senior Convertible Debentures in the principal amount of $250,000.

9. William Paul Simmelink owns W2E's Senior Convertible Debentures in the principal amount of $200,000.

10. Steven Benkovsky owns 527,100 shares of W2E's issued and outstanding common stock and warrants to purchase up to an additional 75,000 shares. Benkovsky also owns W2E's Senior Convertible Debentures in the principal amount of $2,000,000.

11. W2E has failed to make the required payments on the debentures. Declaration of Peter Bohan, dated August 5, 2011 ("Bohan Decl."), *Ex, B*. W2E therefore is in default of its payment obligations to the Petitioning Creditors, and the amounts in default are not subject to any contingency or bona fide dispute.

## JURISDICTION AND VENUE

12. On August 8, 2011, the Petitioning Creditors commenced these proceedings by filing an involuntary chapter 11 bankruptcy petition against W2E.

13. The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

14. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## STATEMENT OF FACTS

*The Debtor's Business*

15. W2E was originally formed by Taylor as a private company, which undertook a private placement of stock for approximately $5 million in 2007. The proceeds of the equity sale were used to acquire most of W2E's existing technology from an Icelandic company known as Enerwaste. In 2009, W2E became a public company through a reverse merger with a defunct Internet company, Maven Media Holdings, Inc. *See* W2E Form 8-K, dated June 3, 2009. W2E raised additional funds in 2009 by issuing debentures and warrants. Declaration of Carmelo Luppino dated August 8, 2011 ("Luppino Decl.") ¶¶ 5-6.

16. W2E engages through its wholly-owned subsidiaries in the business of supplying proprietary gasification technology that converts into clean renewable energy municipal solid waste, biomass, and other solid waste streams traditionally destined for landfill. W2E competes in the growing worldwide market for waste-to-energy systems that simultaneously destroy waste and recover energy via customized engineering solutions that are scalable, modular, and robust enough to operate in remote environments. *Bohan Decl., Exh. A*; *Houghton Decl., Exh. C*.

17. W2E's primary asset is its equity interests in its subsidiaries. Upon information and belief, all of the intellectual property is held by Waste2Energy Technology International Limited, an indirect wholly-owned non-debtor subsidiary of W2E organized and existing under the laws of the Isle of Man ("W2E IoM").

18. Though W2E is a publicly-traded company, its board of directors consists of only one member: Taylor. Upon information and belief, Taylor and Murphy are responsible for all decisions made on behalf of W2E and each of its subsidiaries. Ostensibly employed by W2E IoM as a "consultant," Murphy has dominated the operations of W2E and its subsidiaries through his personal and business relationships with Taylor dating back many years, effectively

acting as Chief Executive Officer of W2E until formally assuming that role in May 2011. The private placement memorandum for the private stock offering in 2007 nowhere mentioned Murphy's involvement in the company. *Luppino Decl. ¶ 3*.

19. Taylor originally retained Murphy under the guise of being a consultant for the build-out and operations of a waste-to-energy plant in Scotland (the "Dargavel Plant"), despite it being unclear what, if any, expertise Murphy had for this position, as his previous business experience was in real estate in the southeastern United States (a venture that ended in bankruptcy in 2004). The Dargavel Plant was to be owned and operated by ASCOT Environmental ("ASCOT"), a UK company that was to license the technology. When W2E was raising money through the private equity offering in 2007, investors were shown a video of what was represented to be a fully functional Dargavel Plant. Contrary to the representation, the Dargavel Plant did not become mostly operational until this year, and the Plant still remains under construction four years after the presentation of the video. *Luppino Decl. ¶ 3*.

20. Neither the private placement memorandum for the initial equity offering nor the offering memorandum for the debentures disclosed that W2E could not obtain a performance bond for any project to construct a waste-to-energy plant; nor did either document disclose that W2E had not paid its subcontractors, who were refusing to work with W2E. Without the ability to post a performance bond, W2E could not possibly proceed with any construction projects. *Luppino Decl. ¶ 10*.

*The Agreements with WTEC*

21. Pursuant to a License Agreement, dated as of June 7, 2010 (the "Canadian License Agreement"), W2E IoM granted to WTEC exclusive distribution and manufacturing

rights for W2E's intellectual property throughout Canada. Declaration of Alistair Haughton, dated August 5, 2011 ("Haughton Decl.") ¶¶ 11, 15.

22. The Canadian License Agreement, which was executed by Taylor on behalf of W2E IoM, included a representation that W2E IoM:

> (i) has the requisite power and authority and the legal right to enter into this Agreement and to perform its obligations hereunder and (ii) has taken all requisite action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder. This Agreement has been duly executed and delivered on behalf of such Party, and constitutes a legal, valid, binding obligation, enforceable against such Party in accordance with its terms.

*Houghton Decl., Exh. D.*

23. The Canadian License Agreement provided for WTEC to pay W2E IoM $250,000 in exchange for the concurrent deposit of the licensed intellectual property into escrow. *Haughton Decl. ¶ 17*. On September 10, 2010, WTEC paid the $250,000, and W2E delivered a written undertaking to deposit the intellectual property into escrow within five business days. *Id., Exh. E*. W2E failed to deposit the intellectual property into escrow. *Id. ¶ 32*. In response to WTEC's inquiry about the delay, W2E's then-Chief Executive Officer, Peter Bohan, stated that W2E could not afford its $5,000 share of the escrow fee. WTEC agreed to pay W2E's share of the escrow fee to prevent any further delay. *Id. ¶¶ 23-24*. Despite repeated requests by WTEC and the escrow agent, W2E continued to delay the deposit. W2E eventually made a deposit in late November, 2010, but the deposit was woefully incomplete and insufficient for providing the necessary technology to execute any plant development. W2E later made another deposit, but the escrow agent still did not receive all of the materials required by the Canadian License Agreement. *Id. ¶¶ 25-27*. Though Murphy has boasted as recently as June 2011 that he could deliver the intellectual property within "a week," W2E has

still not complied with the escrow requirements of the Canadian License Agreement. Declaration of Jared Gurfein, dated August 5, 2011 ("Gurfein Decl.") ¶ 9.

24. In September 2010, W2E informed WTEC that it needed additional funds. WTEC agreed to provide funds in consideration for an amendment to the Canadian License Agreement. Upon receiving the executed Amended License Agreement on October 8, 2010, WTEC wired USD $60,000 to W2E. *Haughton Decl. ¶ 33; id., Exh. J.*

25. On or about December 26, 2010, W2E informed WTEC that the financial commitments for the completion of the Dargavel Plant had fallen through and, without this funding, W2E would be unable to complete the Dargavel Plant. W2E once again requested financial assistance from WTEC, and once again WTEC complied. WTEC paid approximately $250,000 to subcontractors to complete the Dargavel plant pursuant to an International Cooperation Agreement made with W2E. *Haughton Decl. ¶¶ 36-37, id., Exh. K.*

26. In May 2011, CoGen, a business group located in Scotland, approached W2E about developing four cogeneration projects, the first of which was called "Throsk." W2E did not have the balance sheet stability for bonding these projects. Instead, W2E agreed to transfer to WTEC the Throsk business opportunity in consideration of $100,000, plus (i) $200,000 upon the signing of an agreement to deploy Throsk; (ii) $700,000 upon contract deposit; and (iii) 8% of the project margin. W2E and WTEC executed the agreement on May 9, 2011, and WTEC transferred $100,000 to W2E four days later. *Haughton Decl. ¶¶ 41-42; id., Exh. L.*

27. Shortly after receiving the funds for Throsk, W2E entered into a UK and Ireland Exclusive Licensing/Master Services Agreement with ASCOT, the owner of the Dargavel Plant. The owners of the Throsk project were then contacted by ASCOT and informed that

WTEC would have no further involvement and that all purchases had to go through ASCOT. *Haughton Decl. ¶ 43*.

28. Also, in May 2011, Taylor and Murphy promised the Petitioning Creditors that W2E would not to take any significant corporate actions without their consent. *Luppino Decl ¶ 12*. Simultaneously, Murphy and Taylor had W2E execute an exclusivity agreement with ASCOT effectively contravening UK projects in which WTEC was already engaged. *See* W2E Form 8-K dated June 7, 2011. This promptly followed with a cease and desist letter from ASCOT to WTEC. Declaration of Andrew Savage, dated August 5, 2011 ("Savage Decl.") Exh. B.

29. At a meeting in June 2011 in New York City, Murphy and Taylor proclaimed to WTEC's management that "the license agreement is not valid and we've known that for over a year," claiming that, among other things, no proper corporate resolution had ever been adopted to authorize the agreement. *Gurfein Decl. ¶ 6*. Taylor adhered to this outlandish claim despite having signed three amendments to the Canadian License Agreement. Murphy also insisted that, rather than being allowed build the plants itself or through contractors of its choosing, consistent with the Canadian License Agreement and related agreements, WTEC would instead be required to make an immediate cash payment to W2E of $2 million and buy pre-fabricated plants from an unnamed Chinese company at costs and rates that were far in excess of what WTEC could produce on its own. *Houghton Decl., ¶ 62*; *Gurfein Decl. ¶9*.

30. In response to repeated demands that management provide a restructuring plan detailing how W2E will pay its defaulted obligations, Murphy provided certain of the Petitioning Creditors with a memorandum of the intended agreement with the Chinese company, claiming that it had not yet been finalized. *Luppino Decl. ¶¶ 11, 14* . By the terms in

Murphy's memorandum, the Chinese company would be the exclusive manufacturer of the units based on W2E's technology. This, like the ASCOT transaction, directly contravenes W2E's commitments to WTEC. Despite having taken lavish, week-long trips to China at W2E's expense, Murphy and Taylor have yet to disclose the identity of the Chinese company.

31. As a direct result of Taylor's and Murphy's shenanigans, W2E stands in material breach of the Canadian License Agreement. *Haughton Decl. ¶ 32*. This breach has exposed W2E to massive liability. WTEC has agreements in place as licensee of W2E for hundreds of millions of dollars in projects. *Id. ¶70*. Should WTEC be unable to perform on these contracts, WTEC could hold a claim of hundreds of millions of dollars for breach of contract, which will render W2E completely and hopelessly insolvent and destroy the possibility of any real recovery to the Petitioning Creditors, whose claims are a fraction of that amount.

32. Taylor and Murphy's shenanigans have also eliminated the revenue stream of royalties to W2E that would have emerged once WTEC began building its projects. Just one example of the credibility of the WTEC projects is a major commitment to the government of Russia that would involve deployment of the W2E IoM technology W2E was due to deposit long ago. *Haughton Decl., Exh. X*.

*Murphy's Abusive Behavior*

33. Murphy has consistently abused senior managers, which led to the departure of Fridfinnor "Finni" Einarsson, the Chief Technical Officer of Waste2Energy Engineering Ltd. ("W2EE"), a subsidiary of W2E, leaving W2E without one of its most experienced experts in the Batch Gasification Process, the core of W2E's business. In a letter dated August 11, 2010, Einarsson noted, "Murphy's people skills consist first and foremost of controlling people with

fear and humiliation." *Bohan Decl., Exh. C*. By August 2010, Peter Bohan, then-CEO of W2E, asserted in an e-mail that he "did not believe a word Murphy" told him. *Id., Exh. G*.

34. Murphy has directed his abusive style at customers, going so far as to endanger a $40 million contract for a waste-to-energy plant on the Caribbean island of Sint Maarten. In late 2008, W2E contracted to work with Terra Navita to develop a proposal for the plant. By early 2010, Murphy appeared to be pathologically fixated on destroying the deal through conduct utterly inappropriate for a business relationship. In an e-mail dated February 17, 2010, in response to a request from Tarik Kemp of Terra Navita that a technical expert make a site visit, Murphy insulted the recipient and asserted that the Commissioner from Sint Maarten "was a complete ASS." *Bohan Decl., Exh. D*. Understandably upset, Terra Navita requested that W2E "see to it that John Murphy never again refers to our client the way he did." *Bohan Decl., Exh. E*. Murphy's conduct did not improve, and he continued to take an insulting and patronizing tone to W2E's partners in this venture. He also refused to provide vital technical information to Terra Navita. After several months of such behavior, on April 20, 2010, Terra Navita requested that W2E "guarantee that Murphy's involvement with the project ends here." *Bohan Decl., Exh. F*. Terra Navita has informed the Petitioning Creditors that Terra Navita is unwilling to continue working with W2E unless the current management, including Murphy, is removed. *Savage Decl., Exh. A*.

### *Improper Personal Use of Corporate Funds and Self-Dealing*

35. As managing director of W2EE, Murphy has "directed the company as it was his private property rather than a public corporation." *Bohan Decl., Exh. C*. Murphy has had W2EE pay to construct a putting green for him, pay for extensive redecorating at a rented premise in Scotland, pay for expensive meals with no business purpose, and purchase two

Mercedes and a Jaguar for the personal use of its directors, even though the company was in no financial condition to make such purchases. Further, Murphy solicited funds from W2E by specifically providing "uses of proceeds" to Bohan that did not mention any of those items. *Id., Exs. C & H.* An audit of the expenses Murphy has charged to W2E and its subsidiaries revealed a litany of inappropriate charges – some of several thousand dollars – ranging from vacation weekends for family and friends to clothing. *Id., Exh. I.*

36. Both Taylor and Murphy have used corporate funds to purchase tickets for international airline travel for family members not associated with W2E or any of its affiliates. *Bohan Decl., Exh. J*

*Delinquent and Inadequate SEC Filings*

37. W2E has not filed a Form 10-Q quarterly report since its report for the second quarter of 2010 and has not filed a Form 10-K annual report for the fiscal year ending March 31, 2011. In a letter dated March 31, 2011, the SEC noted the failure to file quarterly reports and also noted inconsistencies in the Form 10-K for the fiscal year ending March 31, 2010, previously-filed Form 10-Q quarterly reports, and financial statements. *Bohan Decl., Exh. K*. The Securities and Exchange Commission requested an explanation of the problems with W2E's prior filings. On April 13, 2011, W2E simply informed the SEC that it had no money to retain the professionals to prepare a response. *Id., Exh. L.*

38. Upon information and belief, the SEC is investigating W2E. At least one of the Petitioning Creditors, Luppino Landscaping, has been subpoenaed by the SEC seeking documents relating to W2E. *Luppino Decl. ¶ 15.* WTEC has also been contacted by the SEC in the course of an investigation involving the W2E. *Haughton Decl. ¶ 51.*

*Murphy's and Taylor's Nefarious Backgrounds*

39. In 2004, Murphy filed for personal bankruptcy under Chapter 7 in the Middle District of Florida, claiming debts in excess of $5 million. *Rivertree Landing, LLC v. Murphy (In re Murphy)*, 2007 Bankr. LEXIS 3521 at *13 (Bankr. M.D. Fla., opinion dated Oct. 16, 2007). In an opinion denying Murphy a discharge, Bankruptcy Judge Karen S. Jennemann stated that Murphy "has a long history of being less than truthful with his creditors and freely manipulates the appearance of his financial condition when he thinks it will work to his advantage." Id. at *1. This opinion was affirmed by District Judge Gregory A. Presnell. *Murphy v. River Tree Landing LLC (In re Murphy)*, 2008 U.S. Dist. LEXIS 41504 (M.D. Fla., May 27, 2008).

40. The "main asset" in Murphy's bankruptcy case was the stock of the Xethanol Corporation. 2007 Bankr. LEXIS 3521 at *38. Murphy was an early investor in Xethanol and held at least 750,000 shares, either personally, through his wife, or through a trust. *Id.* at *39-40. Until well after Murphy's bankruptcy filing, Taylor was Chairman and Chief Executive Officer of Xethanol.[2]

41. On August 7, 2006, the website sharesleuth.com published an in-depth expose of Xethanol (available at http://sharesleuth.com/investigations/2006/08/xethanol-corp/). The expose brought up several extremely disturbing facts: Many of Taylor's former business partners had been convicted of fraud and other charges and had served prison time; many of Xethanol's largest investors had been subject to SEC regulatory actions; Taylor had falsified his résumé. Taylor resigned in the wake of the Sharesleuth report, as did a number of directors,

---

[2] Xethanol is currently in bankruptcy under a different name before this court. *See* In re Global Energy Holdings Group, Inc., et al, Case No. 09-14192 (PJW).

and Xethanol eventually conceded to the SEC that it had made misrepresentations. Matthew B. Arnould, Note and Comment: A Maverick Achieves Something Nobler than Simple Rebellion: Why Sharesleuth is Legal Under Section 10(B) and Rule 10b-5, and why it Should Remain that Way, 103 NW. U.L. REV. 335, 342-3 (2009).

42. Perhaps most troubling is the inconsistency of filings undertaken by W2E since becoming a public entity in 2009. Murphy and Taylor have selectively filed only those reports that strategically accomplish their aims, whatever those aims may be. For example, the Canadian License Agreement, and its various amendments, have NEVER been disclosed in an 8-K. By contrast, the exclusivity arrangements with ASCOT, which contravene the Canadian License Agreement, were filed on June 7, 2011. *See* W2E Form 8-K, June 7, 2011. Moreover, a GBP165,000 payment was to be made and, upon information and belief, has been made to ASCOT as part of the exclusivity agreement (upon information and belief, to reimburse ASCOT for certain money it provided W2E early in building the Dargavel Plant). *See id.* The Petitioning Creditors can only speculate where W2E found nearly $300,000 to make that payment given that to their knowledge, and based on representations made by Murphy to the Petitioning Creditors, W2E was down to under $200,000 in cash three months ago. *Luppino Decl* ¶ 13. It would thus appear that whether it is the mysterious Chinese manufacturing partner or some other source, W2E has brought in significant capital and failed to disclose it to anybody, including the public and the creditors of W2E. These shady dealings again suggest that management is protecting only its own interests and has no regard for the stakeholders of W2E or its commercial partners.

# ARGUMENT

## THE COURT SHOULD ORDER THE APPOINTMENT OF A TRUSTEE TO ACT AS A DISINTERESTED FIDUCIARY FOR W2E'S ESTATE

43. The authority to appoint a trustee is set forth in Section 1104 of the Bankruptcy Code, which provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.

44. Though Chapter 11 contemplates that, under normal circumstances, current management will remain in control of the debtor, a trustee should replace management if management's conduct could damage the estate or hinder the reorganization efforts. *See In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989). Section 1104 "represents a protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). Courts have allowed the appointment of Chapter 11 Trustees even in the "gap period" after the involuntary petition, but before the order of relief. *In re Professional Accountants Referral Services, Inc.*, 142 B.R. 424, 431 (Bankr. D. Colo. 1992).

A. **CAUSE EXISTS FOR THE APPOINTMENT OF A TRUSTEE UNDER SECTION 1104(a)(1)**

45. Section 1104(a)(1) is not an exclusive list of causes that mandate the appointment of a trustee but covers a wide range of conduct, and courts are given considerable discretion as to whether a trustee should be appointed based upon the particular circumstances of each case. *See Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1988). Courts have found "cause" for appointment of a trustee based on factors such as "conflicts of interest ... ; misuse of assets and funds; inadequate recordkeeping and reporting; nonfiling of required documents, including lack of adequate disclosure; lack of appropriate cost controls; various transgressions as to taxes, including nonpayment of taxes, failure to file returns, and nonwithholding of taxes; various instances of conduct found to establish fraud or dishonesty; failure to make required payments; and lack of credibility and creditor confidence." *Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.)*, 1997 WL 129346, *4 (D. Del. March 4, 1997) (quoting *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988)). Ample cause exists for appointing a trustee for W2E under section 1104(a)(1).

46. Taylor and Murphy, without regard to their fiduciary responsibilities, have done everything possible to destroy the relationship with W2E's only legitimate commercial partner – WTEC –thereby diminishing the value of W2E's primary assets and exposing W2E and its subsidiaries to enormous liability for breach of contract. Whether their conduct *vis a vis* WTEC amounts to fraud, it is without question dishonesty on a mind-boggling scale. *See In re Bellevue Place Assocs.*, 171 B.R. at 623 (though none of the specifically enumerated "causes" under 1104(a)(1) was applicable, debtor's inability to fulfill fiduciary duties was itself cause to appoint a chapter 11 trustee).

47. Taylor and Murphy have sought to abandon the relationship with WTEC in favor of a partially disclosed relationship with an undisclosed Chinese company. *See In re Concord Coal Corp.,* 11 B.R. 552, 554-55 (Bankr. W. Va. 1981) (appointment of trustee was justified when loyalty of debtor's current management was called into question).

48. Taylor and Murphy's management has been marked by inappropriate uses of corporate funds, bullying of employees, abuse of business partners, and open denigration of customers. *See In re SunCruz Casinos, LLC*, 298 B.R. 821, 830-32 (Bankr. S.D. Fla. 2003) (concluding that "cause" existed to appoint chapter 11 trustee given the numerous significant inherent conflicts of interest of debtor's management).

49. Under Taylor and Murphy's auspices, W2E has failed to comply with the reporting requirements of the Securities Laws.

50. Taylor and Murphy have repeatedly lied to investors, promising a restructuring plan that never quite appears.

51. Taylor and Murphy have utterly lost the confidence of W2E's creditors. *See Marvel Entertainment Group,* 140 F.3d at 473-74 (finding sufficient cause based on "deep-seeded conflict and animosity" between the debtor and the creditors, as well as the lack of confidence of all creditors in the ability of the entities controlling the debtor to act as fiduciaries); *In re Cardinal Indus.*, 109 B.R. 755, 765-66 (Bankr. E.D. Ohio 1990) (sufficient cause exists to appoint a trustee pursuant to section 1104(a)(1) due to the creditors' "serious and general loss of confidence in the Debtors' management," despite no finding of any of the enumerated 1104(a)(1) factors).

## B. GROUNDS EXIST FOR THE APPOINTMENT OF A TRUSTEE UNDER SECTION 1104(a)(2)

52. Section 1104(a)(2) provides a flexible standard for the appointment of a trustee even if no "cause" exists, when it is in the best interests of creditors. *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990). Among the factors typically considered under section 1104(a)(2) are (a) the trustworthiness of the debtor, (b) the debtor's past and present conduct and its potential to rehabilitate, (c) the creditors lack of confidence in the debtor's current management, and (d) the costs and benefits of the appointment of a trustee. *Id.* at 167 (citing *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985)); *In re Parker Grande Dev., Inc.*, 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986); *In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D. W.Va. 1981). "[T]he factors . . . are diverse and in essence reflect the practical reality that a trustee is needed." *In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217, 1226 (3d Cir. 1989).

53. Courts have held that loss of creditor confidence in current management and "[t]he need for a neutral party to mediate disputes between the debtor and its creditors is ground for a trustee's appointment." *In re The Bible Speaks*, 74 B.R. 511, 512-13 (Bankr. D. Mass. 1987). *See also Marvel Entertainment Group*, 140 F.3d at 474 ("intense and high-stakes bickering" did not instill confidence that the debtors in possession "could fairly negotiate with the creditors to whom they owe[d] these [fiduciary] duties"); *In re Colorado-Ute Elec. Ass'n*, 120 B.R. 164, 177 (Bankr. D. Colo. 1990) (one benefit of appointing a trustee was that the parties "may be less confrontational and litigious"); *In re Microwave Prods. of Am.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (trustee appointed under § 1104(a)(2) because actions of debtor's board seriously eroded trust and confidence of creditors, which would likely yield increased litigation).

54. A trustee should be appointed under section 1104(a)(2) because independent representation W2E is in the best interests of the estate, the creditors, and the equity holders. W2E holds rights in the promising technology of green energy generation, yet Taylor and Murphy have consistently undermined the company's ability to exploit the technology. Taylor and Murphy's mismanagement, dishonesty, and abusiveness have alienated business partners, employees, investors, and creditors. Given their self-dealing, they cannot be trusted to conduct W2E's affairs in the company's best interest. Their continued tenure as W2E's management is simply untenable.W2E needs management by a representative truly interested in developing W2E's assets and potential.

WHEREFORE, the Petitioning Creditors request that the Court enter an order (i) granting the Motion in its entirety and (ii) granting such other and further relief as is just and proper.

Dated: Wilmington, Delaware
August 9, 2011

**THE ROSNER LAW GROUP LLC**

/s/ *Scott J. Leonhardt*
Frederick B. Rosner (No. 3995)
Scott J. Leonhardt (No. 4885)
824 Market Street; Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111

-and-

**COHEN TAUBER SPIEVACK & WAGNER PC**
Joseph M. Vann, Esq.
Andrew L. Buck, Esq.
420 Lexington Ave., Suite 2400
New York, NY 10170
Direct Number: 212.381.8769

*Counsel for the Petitioning Creditors*