UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

WASTE2ENERGY HOLDINGS, INC.

Debtor.

Case No. 11-12504 (KJC)

Chapter 11

## DECLARATION OF ALISTAIR HAUGHTON IN SUPPORT OF MOTION TO APPOINT A TRUSTEE FOR THE DEBTOR

I, Alistair Haughton, of the City of Courtenay, in the Province of British Columbia, Canada, hereby declare pursuant to 28 USC § 1746:

1. I am the President and Chief Executive Officer ("CEO") of WTE Waste To Energy Canada, Inc. ("WTEC"), a corporation organized and existing under the laws of the Province of British Columbia, Canada. I have personal knowledge of the matters and facts herein deposed to except where they are stated to be based on information and belief, in which case I believe them to be true.

Background

2. Early in 2009, I had a business association with John Caton and Rod Taylor. Mr. Caton runs a resort in British Columbia, Canada and Mr. Taylor runs a resort in the Yukon, Canada, independently of one another. Mr. Caton and Mr. Taylor were considering jointly opening a new resort in the Yukon and at that time, were exploring alternative energy resources for the resort. I was aware of an alternative waste to energy technology which had been in use for approximately 12 years that was operating successfully all over the world and had a proven track record. I came to learn that this waste to energy technology had been sold to Waste2Energy Holdings Inc. ("W2E Holdings").

3. Mr. Caton, Mr. Taylor, Mr. Rick Genovese and I, formed WTEC with the intention of utilizing a waste to energy technology like that owned by W2E Holdings (the "W2E

{00118897.DOC; 3}

Technology"). In mid-2009, WTEC approached W2E Holdings to make queries with respect to the W2E Technology.

Purchase of the sBOS

4. In or about September 2009, WTEC was contacted by Peter Bohan of W2E, and he advised that W2E had a 4 ton Standard Batch Oxidation System ("sBOS") unit in its inventory that was more or less "ready to go" and asked whether WTEC would be interested in purchasing the sBOS unit from W2E. Attached hereto and marked as **Exhibit "A"** to this Declaration is a copy of an email from Peter Bohan to me dated September 24, 2009 which attached a quote with respect to the purchase of the sBOS by WTEC. Peter later informed WTEC that he was informed by his engineering Team that the sBOS would require some basic re-design work (the primary and secondary were mismatched), however this design work was being completed by W2E Engineering and should not hamper delivery of the system.

5. Over the next several months, I was contacted several times by Peter Bohan about the purchase of the sBOS. Attached hereto and marked as **Exhibit "B"** is a series of emails from Peter Bohan to me regarding the sBOS. With the understanding that the re-design work was in fact being completed, WTEC continued to pay for the sBOS and relay to our customer that the system would be ready and meet their operation criteria as planned.

6. On or about December 21, 2009, WTEC paid an initial deposit in the amount of $50,000USD to W2E for the sBOS.

7. On or about February 15, 2010, WTEC paid a further deposit of $100,000USD to W2E for the sBOS.

8. In or about March, 2010, WTEC learned that the sBOS was not in fact "ready to go". When I queried Mr. Bohan as to the reasons why the work had not bee completed, Peter informed me that he only just learned that although W2E Holdings had paid their subsidiary W2E Engineering to do the work and was told the work was in progress and on track, in fact, W2E Engineering had not completed the work. According to Mr. Bohan the decision not to complete the engineering work required and paid for was taken by Mr. Murphy who at the time was in charge of W2E Engineering.

9. To date, despite payment of $150,000USD to W2E for the sBOS, WTEC has never received delivery of the sBOS, nor has the required engineering and design work taken place and by such, we are unable to deploy the sBOS to our customer.

Canadian License Agreement

10. Soon after making initial inquiries about the W2E Technology in 2009, W2E Holdings asked WTEC if it was interested in purchasing W2E Holdings. As WTEC was in its very early beginnings, we determined that it was not prudent at that time to consider purchasing W2E Holdings and, instead, advised W2E Holdings that WTEC would be interested in entering into a licensing agreement for the exclusive manufacturing and distribution rights the W2E Technology, namely to the Single Batch Oxidation System, (sBOS), Continuous Batch Oxidation System ("cBOS"), and Continuous Oxidation Reactor ("COR") (collectively, the "Licensed Products") within Canada.

11. Negotiations between W2E and WTEC for a Canadian license agreement occurred between in approximately December 2009 and June 2010. Both WTEC and W2E were represented by separate legal counsel throughout the negotiations.

12. In late May 2010, W2E and WTEC reached an agreement with respect to the terms of a Canadian license agreement. During the process of legal counsel for W2E and WTEC drawing up the license agreement, WTEC became aware that ownership of the Licensed Products and the related intellectual property was actually held in a company called W2E Technology International Limited ("W2E Technology"). Unless otherwise stated in this Declaration, W2E Holdings and W2E Technology will be collectively referred to ("W2E"). Attached hereto and marked as **Exhibit "C"** to this Declaration is a copy of an organizational chart of W2E which I received from Peter Bohan, President and CEO of W2E Holdings.

13. It was represented to WTEC and its legal counsel that W2E Technology was a wholly owned subsidiary of W2E Holdings which was incorporated pursuant to the laws of the Isle of Man ("IOM"). It should be noted that in the correspondence between W2E and WTEC, W2E Technology is often referred to as ("the IOM") or ("the IOM Company"). It should be noted that WTEC and their legal counsel paid particular attention to this "ownership" structure. WTEC's

Canadian legal counsel conducted a detailed due diligence on this point which included an opinion from a prominent IOM legal firm. At the end of this due diligence, it was determined that WTEC was dealing with the correct representatives from W2E.

14. A meeting between WTEC and W2E was held on June 7, 2010, in the Vancouver, British Columbia offices of WTEC (the "Vancouver Meeting"). In attendance at the Vancouver Meeting on behalf of W2E were Peter Bohan and Chris Taylor, who represented himself as Chairman of the Board of W2E Holdings as well as a director of W2E Technology. In attendance on behalf of WTEC were myself and two other WTEC directors, Rick Genovese and John Caton.

15. WTEC and W2E Technology entered into a license agreement (the "License Agreement") dated June 7, 2010 (the "Effective Date") which was executed by Chris Taylor on behalf of W2E and by me on behalf of WTEC. Attached hereto and marked as **Exhibit "D"** to this Declaration is a copy of the License Agreement.

16. The License Agreement commenced on the Effective Date for a perpetual term.

17. Pursuant to the terms of the License Agreement, on the Effective Date, WTEC was to pay $250,000 (the "Initial Payment") to W2E and concurrently, W2E would deposit into escrow certain intellectual property as set out in the License Agreement (see section 7.5 of Exhibit "D") (the "IP").

18. The IP included the latest series of "all" base drawings, design work, CAD drawings, Mass and Energy Balance Formulas, and automation formulas for the most recent cBOS facility built at Dargavel, Scotland ("Dargavel") as well as any and all design, engineering, CAD and automation formulas which would be needed to produce the sBOS, cBOS and COR technology. This IP was to be deposited specifically to protect WTEC and their present/future clients, and stakeholders in the event W2E were to cease to operate and by such could not provide the required support to WTEC to continue as a business and execute.

19. The License Agreement also provided WTEC the rights to manufacture the sBOS, cBOS and COR technology in Canada and also pursuant to the License Agreement, W2E was to deliver all IP specifications except the Automation Control Modules to approved manufactures

identified by WTEC. The Automation Control Modules were to be supplied by W2E as per the License agreement.

20. On numerous occasions WTEC requested the requisite drawings and CAD work to be delivered to their identified manufacturer in Canada. The requisite data was never forthcoming. As a result, WTEC was unable to neither accurately quote nor achieve a level of comfort with their prospective clients in demonstrating WTEC's ability to manufacture and support the technology in Canada.

21. Notwithstanding the terms of the License Agreement, W2E requested that WTEC pay the Initial Payment to it in advance of receiving the IP on the basis of an undertaking by W2E that the IP would be deposited into escrow within one week (5 business days) from payment of the Initial Payment to W2E. When asked why W2E required the funds so urgently, it was relayed that W2E was desperately short of funds at the moment. W2E explained they had a number of key contracts in the works and close to fruition (deposits were imminent), however needed cash to cover pending employee wages and creditors. In the spirit of the newly formed relationship, the fact that WTEC wanted the "partnership" to flourish, WTEC agreed to make the Initial Payment to W2E in advance of receiving the IP into escrow. At no time did W2E indicate there would be any problem with delivering the IP.

22. On or about September 10, 2010, WTEC paid directly to W2E Holdings the Initial Payment and W2E undertook in writing to deposit the IP into escrow within 5 business days from receipt of the Initial Payment. Attached hereto and marked as **Exhibit "E"** is a copy of the confirmation of payment and signed undertaking of the President and CEO of W2E, Peter Bohan (the "Undertaking").

23. The Undertaking was not complied with and following the expiration of the 5 day time period of the Undertaking, WTEC contacted W2E to determine the cause for delay in depositing the IP into escrow. Peter Bohan advised that the delay was caused by the fact that W2E could not afford to pay its share of the escrow fee to the escrow agent, Iron Mountain.

24. In an attempt to eliminate further delay, WTEC agreed to pay W2E's share of the fee for Iron Mountain in the amount of $5,000

25. Attached hereto and marked as **Exhibit "F"** is a copy of an email from Peter Bohan to me dated November 16, 2010 in which he states that the IP will be shipped via overnight courier to Iron Mountain. The IP was not received by Iron Mountain until on or about November 29, 2010.

26. Upon receipt, Iron Mountain reviewed the initial deposit of IP by W2E. On or about December 8, 2010, Iron Mountain advised Rod Taylor that the IP did not contain the specifications set out by the terms of the License Agreement and was therefore incomplete.

27. In particular, Iron Mountain advised WTEC that the source code was old and would not meet the required format to allow replication; the "script" was written in a programming language which was "tag ladder logic language" which would require a "decoding" tool called a "RSLOGIX for Contrologix Series 5000 tool" in order to decipher the code; line drawings and "As Built" drawings were not organized in a format to allow for replication and contained no CAD; and mechanical and electrical lacked sufficient content to allow for replication.

28. Rocky Pouliot, Controls and Automation Manager for WTEC also reviewed the IP provided by W2E and determined that it was incomplete. On or about February 10, 2011, Mr. Pouliot provided a list of the missing IP to Peter Bohan. Attached hereto and marked as **Exhibit "G"** to this Declaration is a copy of an email chain which includes the request by Mr. Pouliot, an email from Rod Taylor following up Mr. Pouliot's email and a response from Peter Bohan.

29. Attached hereto and marked as **Exhibit "H"** to this Declaration is a follow-up email from Mr. Pouliot to Peter Bohan dated February 15, 2011 with an attached list of required IP that was missing from the initial deposit.

30. Attached hereto and marked as **"Exhibit "I"** to this Declaration is are copies of emails from Peter Bohan dated February 28, 2011 and March 1, 2011 in which he provides information as to W2E's inability to provide the missing IP.

31. In addition, in the process of conducting due diligence for a subsequent offer to acquire the assets of W2E, I discovered that the missing IP was held as collateral by certain W2E creditors, and as such, W2E was never in a position to provide the IP to WTEC.

32. The IP deposited into escrow with Iron Mountain remains incomplete and insufficient to replicate the W2E technology on standalone basis. Further, W2E did not deliver the IP specification to the manufacturer designated and approved by WTEC. Consequently, W2E is in breach of the License Agreement.

Amendment No. 1 to License Agreement

33. In or about September 2010, W2E advised WTEC that it was in need of further financial assistance. On the condition that the License Agreement be amended to address certain concerns of WTEC, WTEC agreed to provide W2E with a further sum of $60,000USD which was paid to W2E on or about October 8, 2010. Attached hereto and marked as **Exhibit "J"** to this Declaration is a copy of Amendment No. 1 to License Agreement dated September 9, 2010 (the "Amendment").

International Cooperation Agreement

34. W2E had been contracted to provide specific services for completion of a plant in Scotland known as the Dargavel plant ("Dargavel"). W2E had provided the owner of Dargavel, ASCOT Environmental ("ASCOT"), with a Statement of Work ("SOW") for the completion of the plant.

35. Shortly after WTEC withdrew its Revised Initial Offer of W2E, another company approached W2E and made an offer, (the "QSTV Offer"). W2E informed me that as part of the QSTV Offer, QSTV was to provide funding in the order of £330,000 to complete the works required at Dargavel. For a number of reasons, QSTV was now unable or unwilling to complete on this commitment.

36. On December 26, 2010, W2E again contacted WTEC for financial assistance. W2E advised WTEC that it found itself in financial difficulty and unable to complete their SOW commitments based on QSTV not providing the required funds to complete the SOW at Dargavel. W2E further advised WTEC that if W2E could not complete the SOW commitments as agreed, Ascot would take legal action which had potential to realize upon the IP held by the IOM Company.

37. In an effort to protect the IP for which WTEC had already paid and was still attempting to obtain from W2E, WTEC agreed to pay on behalf of W2E the agreed sub-trades as per the SOW to initiate and complete the SOW. WTEC thus paid an initial $175,101.86 to the identified sub-trades plus $93,511.15 to W2E Europe to be used to pay various employees of W2E to provide oversight and complete the SOW at the Dargavel plant.

38. On January 2, 2011, W2E and WTEC entered into an International Cooperation Agreement (the "ICA") whereby WTEC agreed to provide $500,000 to facilitate and allow for the development and completion of the Dargavel energy from waste facility on the terms and conditions as provided for in the ICA. Attached hereto and marked as **Exhibit "K"** is a copy of the ICA.

39. The ICA provided for a non-exclusive license to WTEC of the ability to deploy the Licensed Products and associated IP on a global scale in all global markets, subject to the limitations contained in section 4 of the ICA.

Throsk Business Opportunity

40. W2E entered into an agreement to develop a waste to energy project being developed by a company called COGEN in Scotland who are developing approximately four waste to energy projects which would deploy the W2E Technology. The first of these projects is known as the Throsk WFE Facility ("Throsk").

41. In or about May 2011, WTEC was contacted by Peter Bohan of W2E and advised that the Throsk project owners needed certain manufacturing and bonding guarantees, W2E was unable to provide deployment on the Throsk project due to financial instability and inability to obtain proper bonding for the project. W2E offered the Throsk business opportunity to WTEC..

42. On May 9, 2011, W2E entered into an agreement to transfer the Throsk project to WTEC. Attached hereto and marked as **Exhibit "L"** is a copy of the Agreement to the Transfer of the Throsk WFE business opportunity to W2E (the "Throsk Agreement"). It was a term of the Throsk Agreement that $100,000USD would be immediately remitted to W2E upon execution of the Throsk Agreement. On or about May 13, 2011, WTEC paid to W2E the sum of $100,000USD by wire transfer.

43. Shortly following the receipt of the $100,000USD from WTEC, Peter Bohan was fired from his position as President and CEO of W2E Holdings and replaced by John Murphy. During the following two weeks after John Murphy took over as CEO, he entered into on behalf of W2E a UK and Ireland exclusive licensing/Master Services Agreement with ASCOT (the owners of the Dargavel facility). Shortly after this transaction, the owners of the Throsk project were contacted by ASCOT and informed that WTEC no longer had any involvement, rights, or participation of any kind in the project and that any purchase of equipment, engineering, and deployment must go through ASCOT as per their licensing/Master Services Agreement with W2E.

Offers to Acquire Assets of W2E

44. Between August 23, 2010 and June, 2011, at the request of W2E, WTEC made numerous offers to acquire the assets of W2E.

45. An offer was made by WTEC on October 6, 2010, which was accepted by W2E. This offer was later revised on November 2, 2010 and accepted by W2E on November 3, 2010 (the "Initial Offer"). Attached hereto and marked as **Exhibit "M"** to this Declaration is a copy of the Initial Offer.

46. WTEC conducted certain due diligence with respect to the Initial Offer.

47. After a period of time, WTEC and W2E both agreed that the Initial Offer would not be able to close, largely due to the fact the W2E's investment bankers and creditors were not prepared to accept the terms of the Initial Offer. The Initial Offer was subsequently withdrawn by WTEC.

48. I have recently learned that at approximately the same time that W2E had agreed to the Initial Offer with WTEC, it had also executed a letter of intent and term sheet for the acquisition of W2E's assets by a company known as QSTV.

49. Soon after the request by W2E for assistance with the Dargavel crisis, W2E asked once again for WTEC to consider another offer to acquire the assets of W2E. WTEC informed W2E that it would be interested; however this new offer would not be on the same terms as the Initial

Offer, primarily because of the incomplete IP, negative business environment, and general "bad will" about W2E that was present in the market place.

50. WTEC submitted several versions of this revised type of offer to W2E in January 2011 and again on June 17, 2011 (the "Revised Offer"). Attached hereto and marked as **Exhibit "N"** to this Declaration is a copy of the Revised Offer.

51. Shortly after submitting our Revised Offer, WTEC's legal counsel was contacted by the US Securities and Exchange Commission (the "SEC"). I cannot disclose the content of this investigation. I can disclose that after multiple discussions with the SEC, our legal counsel advised us that in order for us to continue with our bid to acquire the assets of W2E, WTEC would need to cease interactions with W2E's investment banker, Charles Vista, and that WTEC would need to approach all W2E debenture/note holders individually with the Revised Offer and confirm that each of the debenture/note holders were in fact accredited investors. As a result of the direction given by our lawyers in consultation with the SEC, WTEC incurred a further approximately $58,226.35USD in legal fees and the closing of the Revised Offer became indefinite.

52. The Revised Offer was extended and then extended again. Given the difficulties of acquiring the needed responses from the debenture/note holders, the Revised Offer was allowed to expire.

Management of W2E

53. From approximately December 2010, when WTEC began negotiations with W2E until May 2011, WTEC's dealings with W2E were almost exclusively with Peter Bohan, the President and CEO of W2E. Peter Bohan executed the International Cooperation Agreement and the Throsk Agreement on behalf of W2E Holdings and at all times, WTEC understood Mr. Bohan to have the authority to do so. Furthermore, Mr. Bohan was always in contact with Mr. Taylor and did not enter into nor execute any agreements without the authority of Mr. Taylor.

54. WTEC also had dealings with Chris Taylor, who held himself out to be, and WTEC understood to be, the Chairman of the Board and sole board member of W2E Holdings. Mr. Taylor executed the License Agreement, the Amendment No. 1 to the License Agreement, and

the International Cooperation Agreement on behalf of W2E Technology and at all times, WTEC understood Mr. Taylor to have the authority to do so.

55. At some point during WTEC's dealings with W2E, we came to learn of an individual named John Murphy. And subsequently, we were advised by Peter Bohan that Mr. Murphy had been previously involved with W2E, but that his role and responsibilities had been minimized for untold reasons.

56. In or about February 2011, John Murphy and a group of companies in which he has either holdings or a controlling interest began advising WTEC of numerous claims he had against W2E. Attached hereto and marked as **Exhibit "O"** to this Declaration is a copy of correspondence from counsel for Fulcrum Properties, Inc. and its affiliates, subsidiaries (including Atlantic Strategy Advisors, LLC) and its key personnel. Fulcrum Properties, Inc. and Atlantic Strategy Advisors, LLC are both companies in which Mr. Murphy has either an influence or significant holdings. Attached hereto and marked as **Exhibit "P"** to this Declaration is a copy of correspondence dated March 8, 2011 from John Murphy to me requesting payment of an invoice from Fulcrum Properties, Inc. Also attached hereto and marked as **Exhibit "Q"** to this Declaration is a copy of correspondence from John Murphy dated April 8, 2011 which makes reference to a claim by John Murphy to have his contract paid.

57. It was my belief that Mr. Murphy hoped that his claims would be satisfied by WTEC when and if WTEC purchased the assets of W2E. Attached hereto and marked as **Exhibit "R"** is a copy of any email dated February 17, 2011 from Peter Bohan which essentially outlines the reasons why John Murphy's claims are not legitimate.

58. While conducting due diligence with respect to the Initial Offer, I learned that notwithstanding the standstill clause contained in the Initial Offer whereby W2E was not able to enter into any material agreements during the standstill period without the express consent of WTEC, a contract with Atlantic Strategy Advisors, LLC, was renewed by John Murphy and approved by Christ Taylor, thus further indebting the IOM Company, and by such placed Mr. Murphy and Mr. Taylor as the top 2-creditors over the IOM.

59. On or about April 6, 2011, John Murphy began advising WTEC that both the License Agreement and the International Cooperation Agreement were invalid as a result of them not having been approved by the W2E Technology/IOM board of directors. Attached hereto and marked as **Exhibit "S"** to this Declaration is a copy of correspondence from John Murphy to me dated April 6, 2011.

60. Mr. Murphy has taken the position that Chris Taylor and Peter Bohan had no authority to enter into any agreement on behalf of W2E Technology. However at all times, prior to execution of both the License Agreement and the International Cooperation Agreement, Mr. Taylor and Mr. Bohan represented to WTEC that he held the requisite authority to enter into the agreements. Furthermore, at all times, it was my understanding that W2E Technology is a wholly owned subsidiary of W2E Holdings and that Mr. Taylor is a director of both W2E Holdings and W2E Technology.

61. Also, on or about April 6, 2011, WTEC learned that a number of key employees were leaving W2E including engineers, the chief technology officer, project engineer and possibly the head salesperson.

62. On or about June 11, 2011, Alistair Haughton, Rod Taylor, David Hanegraaf, Chris Taylor, John Murphy and Jared Gurfein (legal counsel for the debenture/note holders) attending a meeting in New York City. At this meeting, John Murphy again stated that our licenses and agreements were invalid and would not be honored by W2E unless WTEC paid $2M in cash to the IOM Company, WTEC would be unable to use the W2E Technology. John Murphy stated that he viewed the $2M payment as settlement of all damages cause by WTEC to W2E. Mr. Murphy also stated that he intended to implement a Master Services Agreement whereby WTEC would be entitled to use the W2E Technology, in exchange for the payment of the $2M, use of W2E manufacturing services at cost plus 25%, as well as payment of a percentage of WTEC's contracts to the IOM Company (the "MSA Deal"). David Hanegraaf asked what the next steps were and Mr. Murphy advised us to draft up our thoughts as to how to proceed, and then WTEC and the IOM Company would negotiate a memorandum of understanding, however any approach other than outlined by him would be rejected and a waste of our time. Mr. Hanegraaf asked Chris Taylor as to the status of the proposed deal that Mr. Taylor had tabled on or about May 30, 2011 at a meeting between he, Mr. Hanegraaf and I at Mr. Taylor's house in West Hampton. At that meeting,

Mr. Taylor had proposed that WTEC invest cash directly into the IOM Company for which WTEC would get controlling interest in the IOM Company via a majority share ownership and the debenture holders would be paid out of future WTEC revenues. Mr. Taylor informed us that that offer was no longer on the table. At this point I asked Mr. Murphy when he informed W2E that the IOM board considered the WTEC/W2E license agreement to be invalid, to this Mr. Murphy stated 7-days after the agreement was executed on June 7, 2010. I then asked Mr. Taylor if this was correct and he said yes, I then asked Mr. Taylor why you did did not inform us of this; Mr. Taylor mumbled something about his counsel. I then asked Mr. Taylor with this information in hand you still took USD$250,000.00 from WTEC in September of 2010 as the initial payment on the CDN License agreement, Mr. Taylor said yes. I then asked why he still said nothing about the IOM contesting the CDN License agreement, Mr. Taylor did not respond. I then said you then took a further USD$60,000.00 for an amendment to the CDN License in October of 2010. I then said; in November of 2010 you personally negotiated with WTEC the International Cooperation Agreement (ICA), which is based on the tenets of the CDN License agreement, you agreed to and executed the ICA taking a further $250,000.00 from WTEC, yet the whole time knowing the CDN License agreement was being contested. Mr. Taylor had no answer as I recall. It needs to be noted that: Mr. Taylor and Mr. Murphy were in communication constantly during the period all agreements were executed and that Mr. Murphy as Director of the IOM and W2E Engineering would have had full knowledge of what was taking place and would have had access to these funds. The meeting was then adjourned.

63. On or about June 13, 2011, I received correspondence from Chris Taylor which is attached hereto and marked as **Exhibit "T"** to this Declaration. This correspondence reiterated the terms of the MSA Deal that Mr. Murphy and Mr. Taylor proposed at the New York City meeting.

64. As discussed previously in paragraph 49 of this Declaration, WTEC made the Revised Offer to W2E on June 17, 2011.

65. On June 22, 2011, I received a memo from Mr. Murphy, a copy of which is attached hereto and marked as **Exhibit "U"** to this Declaration. This memo again reiterated the MSA Deal and stated that W2E would only consider a relationship with WTEC on the basis of the terms of the MSA deal.

Other Financial Contributions By WTEC

66. In or about the beginning of January, 2011, WTEC was advised by Peter Bohan that W2E was facing a winding up order of one of its related companies, Waste2Energy Engineering Ltd. ("W2E Engineering") as a result of legal action taken by Cochran Limited ("Cochran"). This action was a claim for monies Cochran claimed were owed to it by W2E for work done at the Dargavel facility under direction from W2E as a result of W2E's failure to pay the outstanding invoice.

67. WTEC was concerned that an order of this nature would affect all of W2E's UK dealings. As WTEC, through its agreements with W2E, had a considerable stake in the UK waste to energy market, WTEC was interested in attempting to find a solution which would resolve the dispute with Cochran with W2E and consequently, WTEC paid a lawyer, Alasdair Bryce, to attempt to find a solution to the dispute with Cochran.

68. As WTEC intended to purchase the assets of W2E, it wanted to provide comfort to W2E's creditors that they would be paid in the event that the assets were sold to WTEC. However, notwithstanding the WTEC's efforts to reach a solution with Cochran and other creditors, WTEC could not step into the shoes of W2E and it was necessary for W2E to deal with the situation, which as I understand, it did not. As such, it is my understanding that W2E Engineering was in fact, wound up. Attached hereto and marked as **Exhibit "V"** to this Declaration is a copy of an email chain with respect to the Cochran Limited and W2E Engineering matter.

Losses to WTEC

69. Since June 2010, WTEC has paid to or on behalf of W2E, including indirect funds associated with the legal fees for the License Agreement, Amendment No. 1, the ICA, the Throsk Agreement, SEC investigations, submitted and revised offers, a total of approximately $1,453,622.11CDN. Attached hereto and marked as **Exhibit "W"** is a copy of a spreadsheet prepared by WTEC outlining all payments made in relation to WTEC's dealings with W2E. For this outlay of funds, WTEC has essentially received nothing.

70. It has become increasingly apparent to WTEC that at no time did W2E have any intention of honoring the various agreements that it entered into with WTEC. It should be noted that it is our belief that Mr. Bohan individually was committed and acted in good faith on behalf of the company, however senior factions in the company namely Mr. Taylor and Mr. Murphy were not of the same mind. Furthermore, based on the License Agreement, WTEC has raised more than $3.2M in private capital, set up business solely based around the License Agreement and associated technology, formed strategic partnerships with leading international companies, individuals and Governments. In addition, WTEC has entered into a number of contracts with third parties on the basis of the agreements entered into with W2E. For instance, on July 7, 2011, WTEC announced a major deal whereby, inter alia, licensed W2E technology would be used to generate power from waste in Russia. These very high profile projects have been cultivated with the full knowledge of W2E for more than 12-months and involve the highest levels of Russian and Canadian Governments. WTEC has binding agreements with the Russian and Tartarstan Governments, and EPC contractors have been engaged. Attached hereto and marked as **Exhibit "X"** to this Declaration is a copy of a Press Release dated July 7, 2011, entitled "WtEC to clean Russian toxic sites." W2E's breach of the License Agreement, the ICA and the Throsk Agreement, its failure to transfer the IP and its general unwillingness and inability to follow through on commitments made to WTEC have caused a loss of opportunity to WTEC which could translate into a potential loss in the hundreds of millions of dollars.

## WTEC's Commitment

71.     WTEC remains ready, willing and able to close a transaction with W2E on the same terms as those contained in the Revised Offer.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2011.


_____
ALISTAIR HAUGHTON