# Exhibit A

**From:** Peter Bohan [mailto:pbohan@waste2energy.com]
**Sent:** Thursday, September 24, 2009 3:37 PM
**To:** Alistair Haughton
**Cc:** John Caton; Rick Genovese; Tim O'Meara
**Subject:** 4T sBOS Quote

Alistair,

I spoke to Rick this afternoon and he mentioned you were going to go ahead with the 4T sBOS that we have in inventory. I have revised the quote to reflect a $200k down payment and monthly payments following over 3 months + a final amount when it is installed & commissioned and handed over.

The unit has been sitting for a while so we would need 10-14 days to check it out thoroughly prior to shipping.

Within the next week I will also prepare a term sheet for the license agreement (2 options) that we discussed in Vancouver last week.

If you have any questions let me know.

Regards
Peter

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.409 / Virus Database: 270.13.112/2388 - Release Date: 09/24/09 05:52:00



# Waste2Energy, Inc.
## Converting Waste to Energy

# Proposal to ARG Services for
# Immediate Delivery to Yukon Territory:

# One BOS™ of 27m3 Processing Capacity

## 1. Proposed Equipment

Waste2Energy, Inc. (W2E) currently has a new BOS™ plant at Bellingham, WA, that is ready to ship. This new BOS™ was destined for a development site in the Caribbean that was heavily damaged by the recent hurricanes, and the developer has cancelled the order. As a result, W2E can offer this new BOS™ for sale to ARG for immediate delivery at a reduced price. This BOS™ has a batch processing capacity of 27 m$^3$ and is very similar in design and sizing to the BOS™ plant shown at right (Figure 1), which W2E installed in the Cayman Islands two months ago for processing medical waste.



Figure 1. BOS™ gasifier of 27 m$^3$ processing capacity installed in the Cayman Islands in January, 2009, to process medical waste.

The BOS™ plant at Bellingham, WA, offered for immediate sale also has a Primary Gasification Chamber has a processing capacity of 27 m$^3$ and is also equipped with large top and front loading doors (Figure 2, next page). The Secondary Combustion Chamber has a capacity of approximately 6 m$^3$ (Figure 3, next page).

W2E will provide the complete BOS™ process train including its proprietary, automated, digital control system with manual override. Operator interface with the control system is by touch-screen. The control system has SCADA (Supervisory Control & Data Acquisition) data-logging capability. As a recommended option, the control system can provide real-time, continuous, remote access by W2E for technical support, service, and upgrades.

## 2. Summary List of Equipment, Services, and Exclusions

The BOS™ equipment is ready to ship. Optional feed equipment will be quoted on request.

### A. Equipment

W2E is to provide one BOS™ process train with an approximate processing capacity of 27 $m^3$ per batch together with associated equipment as described above in Section 2 and as specified in more detail below. The price quoted in Section 5, below, is FOB the fabrication site at Bellingham, WA, USA.

1. Primary Gasification Chamber

    - Footprint: 4.67 m x 3.14 m.
    - Overall outside dimensions: 4.60 m wide x 3.38 m deep x 4.17 m from ground to highest point.
    - Internal processing capacity approximately 27 $m^3$.
    - Air distribution manifold system.
    - Diesel burners for ignition.
    - Top-loading chute and door, hydraulic actuation. All hydraulics and controls included.
    - Side door for large waste loading and access for maintenance.
    - Manual ash removal through the front door of primary chamber.

    
    Figure 2. BOS™ Primary Gasification Chamber of 27 $m^3$ capacity ready to ship at Bellingham, WA.

2. Secondary Combustion Chamber

    - Footprint: 2.98 m deep x 1.91 m wide.
    - Overall outside dimensions: 4.11 m long x 2.03 m wide x 2.44 m tall (to top of fan) and leg extensions of 1.40 m.
    - Insulated breeching and damper from Primary Gasification Chamber.
    - Secondary fans to develop over 100% excess air.
    - Auxiliary diesel burner to insure maintenance of 1,120° C processing temperature.

    
    Figure 3. Secondary Combustion Chamber of new 4.0 MTPD BOS™ ready to ship at Bellingham, WA.

3. Stack

    - 7.62 m.

4. Controls

    - W2E proprietary, automated, digital control system with manual override.
    - Operator interface by touch-screen.
    - SCADA (Supervisory Control & Data Acquisition) data-logging capability.
    - As an option, the control system can provide real-time, continuous, remote access by W2E technicians for maintenance, service, and upgrades as part of a service contract.

5. Electrical Specifications

    - Volts:     220 or 480 VAC
    - Amps:     100
    - Frequency: 50 Hz or 60Hz
    - Phase:     3

**B. Services**

W2E will provide the complete equipment as well as installation drawings of the BOS™ and associated equipment specified above. W2E will also provide operating and maintenance manuals.

W2E will cooperate with ARG Services (ARG) to arrange shipping to the project site. ARG will carry out all site preparation and provide all necessary utilities and infrastructure at the site.

ARG will install the specified equipment on site by providing all installation management, craft labor, labor supervision, equipment, tools, and materials bought at the site. At an additional cost of US$1,500 per person per calendar day (including travel days) plus expenses, W2E will provide technical supervision for installation and commissioning at the end customer's site. During installation and commissioning, W2E will provide classroom and hands-on training for operating staff and supervisors.

ARG will secure all permits as required. W2E will provide technical information to support the permitting process.

As an option, W2E offers a separate service contract covering maintenance and repair of the BOS™ process train. Such a service contract can include real-time remote monitoring and service by W2E technicians. The cost of such a service contract and the remote monitoring is not included in the price listed below.

### C. Exclusions

1. Foundations and utilities.
2. Installation management and labor supervision.
3. Craft labor, equipment, tools, and materials bought at site.
4. Equipment for loading waste into the BOS™ Primary Gasification Chamber.
5. Air emissions control system. As an option, W2E can provide an air emissions control system, but such a system is not included in the price shown below.
6. Equipment for removing bottom ash from the Primary Gasification Chambers.
7. Heat recovery boiler and piping to the boiler.
8. Bulk storage tank for auxiliary diesel fuel.
9. Permits.
10. Shipping.
11. Technical supervision of installation and commissioning plus operator training on site (provided at additional cost as defined above).
12. Local taxes and duties.

## 3. FOB Price and Delivery Schedule

Based on current information as specified above, and based on the list of included and excluded equipment and service items specified above, W2E offers the firm, fixed price and installation schedule specified below.

**BOS™ FOB price with inclusions and exclusions as listed above:**  US$ 425,000

**Delivery Schedule**

Ready to ship on receipt of down payment.

**Price Validity**

The quoted price is valid for a period of 28 days from the date of this proposal.

**Payment Schedule:**

| | | |
|---|---|---:|
| 1. | Down payment with order | $200,000 |
| 2. | First monthly payment (from date of order) | $60,000 |
| 3. | Second monthly payment (from date of order) | $60,000 |
| 4. | Third monthly payment (from date of order) | $60,000 |
| 5. | Balance upon commissioning and handover | $45,000 |
| | Total | $425,000 |

**Note:** Other than the down payment, all other payments must be covered by an irrevocable and confirmed letter of credit drawn on a major Canadian or American bank.

**Contracting Entity**

The contracting entity will be Waste2Energy, Inc.

**Terms and Conditions**

The terms and conditions of sale appear below as Attachment 1.

## 4. Conclusion

Thank you for considering this proposal. We look forward to discussing it with you at your earliest convenience and adapting the details to your specific needs.

Please contact Tim O'Meara (Technical Sales Manager) in the first instance to discuss technical and commercial issues. I am, of course, also available for any questions.

Signed for and on behalf of W2E, Inc.:

*[signature]*

<u>Signed for and with the authorization of Peter Bohan</u>     Date:   24 September, 2009
Peter Bohan
President and CEO, Waste2Energy, Inc.
Office: 864-679-1625
Mobile: 508-330-3052
Email:   pbohan@waste2energy.com


Proposal approved by:


Signature:                                                                                             Date:

Name (Please Print):

Position:

Company or Agency:

Copy to:

Tim O'Meara
Mobile: 1-319-651-4465
Email:   tomeara@waste2energy.com

# Attachment 1: Waste2Energy Inc. Standard Terms and Conditions of Sale

1. TERMS APPLICABLE

The terms and conditions of Sale listed below are the exclusive terms and conditions applicable to quotations made and orders acknowledged by Waste2Energy Inc. ("Seller") for the sale of products, equipment and parts relating thereto ("Products"). This quotation or acknowledgement is expressly made conditional upon Buyer's assent to such terms and conditions. Any of Buyer's terms and conditions which are in addition to or different from those contained herein, which are not separately agreed to by Seller in writing, are hereby objected to and shall be of no effect. Objections to any terms and conditions herein shall be deemed waived if Seller does not receive written notice thereof within 20 days of this quotation or acknowledgement. Buyer in any event will be deemed to have assented to the terms and conditions contained herein if delivery of any Product is accepted. The term "this Agreement" as used herein means this quotation or acknowledgement to purchase order, together with any attachment hereto, any documents expressly incorporated by reference and these Standard Terms and Conditions of Sale.

2. DELIVERY

Delivery dates are good faith estimates and do not mean that "time is of the essence". Buyer's failure to promptly make advance or interim payments, supply technical information, drawings and approvals will result in a commensurate delay in delivery. Upon and after delivery, title and risk of loss or damage to the Products shall be Buyer's. Unless otherwise agreed in writing by Seller, delivery of the Products hereunder will be made F.O.B. Seller's plant (or F.O.B. point of manufacture for any Product shipped direct to Buyer from any location other than Seller's plant).

3. WARRANTY

In the case of the purchase of NEW EQUIPMENT the Seller warrants to Buyer that the NEW EQUIPMENT manufactured by it will be delivered free from defects in material and workmanship. This warranty shall commence upon delivery of the NEW EQUIPMENT to the Buyer and shall expire on the earlier to occur of 12 months from initial operation of NEW EQUIPMENT or 18 months from delivery thereof (the "Warranty Period").

In the case of PARTS or used or reconditioned equipment, and unless otherwise indicated, Seller warrants to Buyer that the PARTS or the used or reconditioned equipment manufactured by it will be delivered free from defects in material and workmanship. This warranty shall commence upon delivery of the PARTS or used or reconditioned equipment to the Buyer and shall expire 6 months from delivery thereof (the "Warranty Period").

(a) If during the Warranty Period Buyer discovers a defect in material or workmanship and gives Seller written notice thereof within 10 days of such discovery, Seller will, at its option, either deliver to Buyer, F.O.B. point of shipment, a replacement part or repair the defect. Seller will have no warranty obligations under paragraph 3 (a): (i) if the Products have not been operated and maintained by competent personnel and in generally approved industry practice and with Seller's specific written instructions; (ii) if the Products are used in connection with any mixture or substance or operating condition other than that for which they were designed; (iii) if Buyer fails to give Seller such 10 days notice; (iv) if the Products are repaired by someone other than Seller or have been intentionally or accidentally damaged; (v) for corrosion, erosion, ordinary wear and tear or in respect of any parts which by their nature are exposed to severe wear and tear or are considered expendable; or (vi) for expenses incurred for work in connection with the removal of the defective articles and reinstallation following repair or replacement.

(b) Seller further warrants to Buyer that at delivery, the Products manufactured by it will be free of any liens or encumbrances. If there are any liens or encumbrances, Seller will cause them to be discharged promptly after notification from Buyer of their existence.

(c) THE EXPRESS WARRANTIES SELLER NAMES IN THIS PARAGRAPH 3 ARE THE ONLY WARRANTIES IT WILL MAKE. THERE ARE NO OTHER WARRANTIES, WHETHER STATUTORY, ORAL, EXPRESS OR IMPLIED. IN PARTICULAR, THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(d) The remedies provided in paragraphs 3(a) and 3(b) are Buyer's exclusive remedy for breach or warranty.

(e) With respect to any Product or part thereof not manufactured by Seller, Seller shall pass on to Buyer only those warranties made to Seller by the manufacturer of such Product or part which are capable of being so passed on.

4. LIMITATION OF LIABILITY

The remedies of buyer set forth herein are exclusive and the aggregate liability of Seller and its affiliated companies or subcontractors for any claim of any kind for any loss or damage resulting from, arising out of or connected with this Agreement or from the performance or breach thereof, or from the manufacture, sale, delivery, resale, repair or use of any Product, whether based on contract, warranty, tort (including negligence), fault, strict liability, or otherwise, shall in no event exceed the price allocable to Product, which gave rise to the claim. In no event shall Seller or its affiliated companies or subcontractors be liable to Buyer or any party for special, incidental or consequential damages of any nature or for loss of profits or revenue or business opportunity, loss by reason of shutdown of facilities or inability to operate any facility at full capacity, or for increased expenses for plant operations. All liability of Seller under this Agreement for any claim of any kind shall terminate on that date which is the third anniversary of the date of this Agreement. The provisions of this paragraph 4 shall supersede any inconsistent provisions in any instrument forming part of this Agreement.

5. TAXES

Seller's prices do not include any sales, use, excise or other taxes. In addition to the price specified herein, the amount of any present or future sales, use excise, or other tax applicable to the sale or use of the Products shall be billed to and paid by Buyer unless Buyer provides to Seller a tax-exemption certificate acceptable to the relevant taxing authorities.

6. SECURITY INTEREST

Seller shall retain a purchase money security interest and Buyer hereby grants Seller a lien upon and security interest in the Products until all payments hereunder have been made in full. Buyer acknowledges that Seller may file a Form UCC-1 financing statement and may take all other action it deems reasonably necessary to perfect and maintain such security interest in Seller and to protect Seller's interest in the Products.

7. SET OFF

Neither Buyer nor any of its affiliates shall have any right to set off claims against Seller or any of its affiliates for amounts owed under this Agreement or otherwise.

8. PATENTS

Unless the Products or any part thereof are designed to Buyer's specifications and provided the Product or any part thereof is not used in any manner other than as specified or approved by Seller in writing, (i) Seller shall defend against any suit or processing brought against Buyer to the extent based on a claim that any Product, or any part thereof, infringes any United Sates patent, provided Seller is notified promptly in writing and given the necessary authority, information and assistance for the defense of such suit or proceeding; (ii) Seller shall satisfy any judgment entered against Buyer in such suit; and (iii) if such judgment enjoins Buyer from using any product or part thereof, then Seller shall, at its option: (a) obtain for Buyer the right to continue using such Product or part; (b) eliminate the infringement by replacing or modifying all of or part of the Products; or (c) take back such Product or part and refund to Buyer all payments on the purchase price which Seller has received, in which case neither Buyer nor Seller will have any claim against the other under this agreement or arising out of the subject matter of this Agreement. The foregoing states Seller's entire liability for patent infringement on any Product or part thereof.

9. TERMINATION

Buyer may only terminate its order upon written notice to Seller and upon payment to Seller of Seller's termination charges, which shall be specified to Buyer and shall take into account among other things expenses, (direct and indirect) incurred and commitments already made by Seller and an appropriate profit provided, that in no event shall Seller's termination charges be less than 25% of the contract price. In the event of the bankruptcy or insolvency of Buyer or in the event any bankruptcy or insolvency proceeding brought by or against Buyer, Seller

shall be entitled to terminate any order outstanding at any time during the period allowed for filing claims against the estate and shall receive cancellation charges.

## 10. CHANGES

Seller will not make changes in the Products unless Buyer and Seller have executed a written Change Order for such change. Such Change Order will include appropriate adjustment to price and delivery terms. If the change impairs Seller's ability to satisfy any of its obligations to Buyer, the Change Order will include appropriate modifications to this Agreement. If, after the date of this quotation or acknowledgement, new or revised governmental requirements should require a change in the Products, the change will be subject to this Paragraph 10.

## 11. CONFIDENTIALITY

Buyer acknowledges that the information, which Seller submits to Buyer in connection with this quotation or acknowledgement, includes Seller's confidential and proprietary information, both of a technical and commercial nature. Buyer agrees not to disclose such information to third parties without Seller's prior written consent. Seller grants to Buyer a non-exclusive, royalty-free, perpetual license to use Seller's confidential and proprietary information for purposes of this specific order and the Products that are the subject hereof only. Buyer further agrees not to permit any third party to fabricate the Products or any parts thereof from Seller's drawings or to use the drawings other than in connection with this specific order. Buyer will defend and indemnify Seller from any claim, suit or liability based on personal injury (including death) or property damage related to any Product or part thereof which is fabricated by a third party without Seller's prior written consent and from and against related costs, charges and expenses (including attorneys fees). All copies of Seller's drawings shall remain Seller's property and may be reclaimed by Seller at any time.

## 12. END USER

If Buyer is not the end user of the Products sold hereunder (the "End User"), then Buyer will use its best efforts to obtain the End User's written consent to be bound to Seller by the provisions of paragraphs 3, 4, 5, and 11 hereof. If Buyer does not obtain such End User's consent, Buyer shall defend and indemnify Seller and Seller's agents, employees, subcontractors, and suppliers from any action, liability, cost, loss or expense for which Seller would not have been liable or from which Seller would have been indemnified if Buyer had obtained such End User's consent.

## 13. FORCE MAJEURE

(a) <u>Force Majeure Defined.</u> For the purposes of this agreement, "Force Majeure" will mean all unforeseeable events beyond the reasonable control of either party which affect the performance of this Agreement, including, without limitation, acts of God, acts or advisories of governmental or quasi-governmental authorities, laws or regulations, strikes, lockouts or other industrial disturbances, acts of public enemy, wars, insurrections, riots, epidemics, pandemics, outbreaks of infectious disease or other threats to public health, lightning, earthquakes, fires, storms, severe weather, floods, sabotage, delays in transportation, rejection of forgings or castings, lack of available shipping by land, sea or air, lack of dock lighterage or loading or unloading facilities, inability to obtain labor or materials from usual sources, serious accidents involving the work of suppliers or sub-suppliers, thefts and explosions.

(b) <u>Suspension of Obligations.</u> If either Buyer or Seller is unable to carry out its obligations under this Agreement due to Force Majeure, other than the obligation to make payments due hereunder, and the party affected promptly notifies the other of such delay, then all obligations that are affected by Force Majeure will be suspended or reduced for the period of Force Majeure and for such additional time as is required to resume the performance of its obligations, and the delivery schedule will be adjusted to account for the delay.

(c) <u>Option to Terminate.</u> If the period of suspension or reduction of operations will extend for more than six (6) months in any twelve (12) month period, then either Buyer or Seller may terminate this Agreement.

14. GENERAL

(a) Seller represents that any Product or parts thereof manufactured by Seller will be produced in compliance with all Federal, State and local laws applicable to their manufacture and in accordance with Seller's engineering standards. Seller shall not be liable for failure of the Products to comply with any other specifications, standards, laws or regulations.

(b) This Agreement shall inure only to the benefit of the Buyer and Seller and their respective successors and assigns. Any assignment of this Agreement or any of the rights or obligations hereunder, by either party without the written consent of the other party shall be void.

(c) This Agreement contains the entire and only Agreement between the parties with respect to the subject matter hereof and supersedes all prior oral and written understandings between Buyer and Seller concerning the Products, and any prior course of dealings or usage of the trade not expressly incorporated herein.

(d) This Agreement (including these Standard Terms and Conditions of Sale) may be modified, supplemented or amended only by a writing signed by an authorized representative of the Seller. Seller's waiver of any breach by Buyer of any terms of this Agreement must also be in writing and any waiver by Seller or failure by Seller to enforce any of the terms and conditions of this Agreement at any time, shall not affect, limit or waive Seller's right thereafter to enforce and compel strict compliance with every term and condition thereof.

(e) This Agreement and the performance thereof will be governed by and construed according to the laws of the State of New York. The parties hereto irrevocably submit to the jurisdiction of the appropriate state and federal courts sitting in the State of New York and waive any claims as to inconvenient forum. In the event this Agreement pertains to the sale of any Product outside of the United States, the parties agree that the United Nations Convention for the international Sale of Goods shall not apply to this Agreement.