# Exhibit D

# LICENSE AGREEMENT

## – MT 7 June 2010

### June __, 2010

This License Agreement (this "**Agreement**"), effective as of the date first above written (the "**Effective Date**"), is entered into by and between WTE Waste To Energy Canada, Inc., a corporation organized and existing under the laws of the Province of British Columbia, Canada ("**Licensee**"), and Waste2Energy Technology International Limited, a company organized and existing under the laws of Isle of Man ("**Licensor**").

## Section 1:  DEFINITIONS.

For purposes of this Agreement, the terms set forth in this Section 1 will have the respective meanings set forth below:

1.1    "**Act of Insolvency**" means as defined in Section 16.3.

1.2    "**Affiliate**" means, with respect to any person or entity, any other person or entity which controls, is controlled by, or is under common control with, such person or entity, provided, with respect to Licensee, that such other person or entity is not a Competitor of Licensor which gained such control or became controlled by or under common control with Licensee after the date of this Agreement. For purposes of this Agreement, a person or entity will be deemed to control an entity if it owns or controls, directly or indirectly, at least fifty percent (50%) of the equity securities of the subject entity entitled to vote in the election of directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority), or otherwise has the power to direct the management and policies of such other entity.

1.3    "**Bug Fixes**" means repairs, corrections or fixes.

1.4    "**Business Days**" means any day, other than a Saturday or Sunday, on which commercial banks in Vancouver, Canada, are open for commercial banking business during normal business hours.

1.5    "**Calendar Quarter**" means January 1 to March 31, April 1 to June 30, July 1 to September 30 and October 1 to December 31 in each year.

1.6    "**Change of Control**" means any transaction or series of related transactions involving the sale or other transfer of all or any substantial portion of the assets of a Party, or a merger, consolidation, amalgamation or similar corporate combination transaction of such Party with or into another entity, or a transaction or series of related transactions, including a recapitalization, in which persons or entities acquire beneficial ownership of more than fifty (50%) of the voting capital stock of such Party; *provided, however,* a listing of the Licensee's securities on any public stock exchange, investment market or reorganization of the Licensee's group, which may include the transfer of assets between the Licensee and its' Affiliates, will not be deemed a Change of Control.

1.7    "**Claim**" means any civil, criminal, administrative, regulatory, arbitral or investigative action, suit or proceeding or any other similar claim.

1

1.8 **"Competitor"** means, in relation to Licensor, a person whose business is principally or to a significant extent that of the development and sale of solid waste and biomass gasification technology.

1.9 **"Completion"** means a Project is deemed to have been completed upon the earlier of (a) the Licensee's or its Affiliate's receipt of a signed handover certificate from its End User; or (b) when the plant and/or equipment is turned over to the End User for beneficial use..

1.10 **"Confidential Information"** means confidential information of the Disclosing Party, its Affiliates and their representatives, including, without limitation, the Source Code, Documentation, Enhancements, Design Specifications, computer programs, code, algorithms, names and expertise of employees and consultants, past, present and future customers, Know-How, formulas, processes, ideas, inventions (whether patentable or not), schematics and other technical, business, financial and product development plans, forecasts, strategies and information), and the terms of this Agreement, subject to the exclusions set forth in Section 12.4.

1.11 **"Design Specification"** means the base specifications for construction of each of the Licensed Products provided by the Licensor sufficient to build a fully functioning system capable of installation in a commercial environment.

1.12 **"Development and Support Agreement"** means the development and support agreement entered into between the Parties on an even date to this Agreement.

1.13 **"Disclosing Party"** means as defined in Section 12.1.

1.14 **"Documentation"** means instructions, manuals, drawings, notes, charts and other information relating to the development, use, installation, implementation, integration, configuration, operation, modification, maintenance or support of the Licensed Products, including without limitation, the Source Code Documentation.

1.15 **"End User"** means an end user customer of the Licensed Products.

1.16 **"Enhancement"** means Software improvements, modifications, upgrades or Bug Fixes, including those resulting in new functions and features.

1.17 **"Escrow Agreement"** means as defined in Section 7.5.

1.18 **"Escrow Material"** means as defined in Section 7.5.

1.19 **"EULA"** means as defined in Section 3.1.

1.20 **"Exclusive Territory"** means Canada.

1.21 **"Governmental Authority"** means the government of any country or any state or political subdivision thereof and any entity, body or authority, including a court, exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi-governmental entities established to perform such functions, having jurisdiction over the subject matter of this Agreement.

2

1.22 **"Hot Commissioning"** means the first use of a Licensed Product whereby such Licensed Product is brought to an elevated temperature by way of the gasification of waste or of an alternative fuel source, including without limitation petroleum based fuels.

1.23 **"Improvement"** means any intellectual property created by or for a Party which is constitutes an improvement to such Party's Intellectual Property Rights.

1.24 **"Intellectual Property Rights"** means any and all intellectual and industrial property rights recognized under any applicable legislation, including rights provided under: (a) patent law; (b) copyright law; (c) trade-mark law; (d) industrial design law; (e) any other statutory provision or common law principle applicable to this Agreement, including trade secret law; and (f) any and all registrations and licenses in relation to the foregoing.

1.25 **"Know-How"** means inventions, ideas, discoveries, data, instructions, designs, concepts, drawings, prototypes, machines, information, components, processes, methods, tools, developments, innovations, techniques, methods, materials or compositions of matter of any type or kind, technology, protocols, procedures, results, formulae, templates, devices, assemblies, modules, algorithms, trade secrets, computer program code or other know-how, whether or not patentable, and improvements, modifications or refinements thereof, and specifically excludes any Patent Rights.

1.26 **"Laws"** will mean the common law and any other law, statute, regulation, ordinance, rule, order, decree, judgment, consent decree, settlement agreement or governmental requirement of any Governmental Authority.

1.27 **"License Fee"** means as defined in Section 11.1(a).

1.28 **"Licensed IP"** means: (a) all of Licensor's Patent Rights related to its provisional patent application No. **2007/000022** filed in accordance with the Patent Cooperation Treaty, any patents and patent applications whenever filed or issued relating to such Patent Rights, any patents issuing from any of such patent applications, any foreign counterparts of any of the foregoing and any Know-How relating to such Patent Rights; (b) any other non patent related Know How provided by Licensor to Licensee; (c) copyrights in any Design Specifications and Software Specifications relating to the Licensed Products; and (d) any Licensor Improvements thereto to be licensed to Licensee pursuant to Sections 5.2 and 5.3.

1.29 **"Licensed Products"** means the Licensor's Standard Batch Oxidation System (sBOS™), Continuous Batch Oxidation System (cBOS™) and Continuous Oxidation Reactor (COR™) products for which Design Specifications have been delivered to Licensee by Licensor, and **"Licensed Product"** means any one of them.

1.30 **"Licensed Software"** means (a) the Software used in or to operate the Licensed Products and (b) any Enhancements thereto to which Licensee is entitled to receive a license pursuant to this Agreement or the Development Support Agreement.

1.31 **"Licensed User"** and **"Licensed Users"** mean as defined in Section 14.1.

1.32 **"Licensee Improvement"** means any Improvement invented solely by Licensee and/or its Affiliates, agents, or employees, which Licensee would be entitled to practice without

3

the benefit of any of the Licenses granted by Licensor to Licensee pursuant to this Agreement.

1.33 "**Licensor Improvement**" means any Improvement invented solely by Licensor and/or its Affiliates, agents, or employees which constitutes an Improvement to the Licensed IP and Trade Marks arising out of such intellectual property.

1.34 "**Licensor Projects**" means as defined in Section 9.1.

1.35 "**Minimum Royalties**" means as defined in Section 11.1(c).

1.36 "**New Product**" means any product other than a Licensed Product that relates to the production of clean energy from the gasification of solid waste, biomass and other solid waste streams.

1.37 "**Open Source Material**" means software or other material (a) that is distributed under the GNU General Public License as published by the Free Software Foundation, as "free software", "open source software" or under a similar licensing or distribution model or (b) that is distributed under any license that requires that software incorporated into, derived from or distributed with such material be (i) disclosed or distributed in source code form, (ii) be licensed for the purpose of making derivative works, or (iii) be redistributable at no charge.

1.38 "**Party**" or "**Parties**" means Licensor or Licensee or both Licensor and Licensee, as appropriate.

1.39 "**Patent Rights**" means, the rights to and interests in issued patents and pending patent applications that issue as a patent in any country, including all substitutions, divisions, continuations, continuations-in-part, renewals, all letters patents granted thereon, and all reissues, reexaminations, extensions, confirmations, revalidations, registrations and patents of addition thereof, controlled by a Party. For the purposes of this Agreement, a claim of a pending patent application included within Patent Rights, which claim was filed in good faith and has not been abandoned or finally disallowed without the possibility of appeal or re-filing of such application, will be treated as if they were issued patent claims.

1.40 "**Personnel**" means the employees, representative, agents and subcontractors of a Party.

1.41 "**Project**" means a transaction run by the Licensee with an End User involving the sale, lease or other transfer of a Licensed Product.

1.42 "**Receiving Party**" means as defined in Section 12.1.

1.43 "**Royalties**" means as defined in Section 11.1(b).

1.44 "**Software**" means the object code version of any software or firmware written by or on behalf of Licensor and provided to Licensee or to any of Licensee's Affiliates, distributors, resellers or End Users, together with any accompanying Documentation, but specifically excludes any Source Code of such software, any Open Source Material and any Third Party Software for which Licensor does not have the right to provide a sublicense.

4

1.45    "**Software Specifications**" means the written specifications setting out the design specifications and functional performance specifications of the Licensed Software that are set forth in an applicable Statement of Work entered into pursuant to the Development and Support Agreement.

1.46    "**Source Code**" means, with respect to Software, the non-exclusive, human readable version of the Software program being capable, upon compilation, of being translated into object code.

1.47    "**Source Code Documentation**" means, with respect to a Software program to Source Code, all programmer specifications, notes (technical or otherwise), flow charts, layouts, formulas, manuals, quick reference guides, tutorial literature, explanations and other Documentation relating to the Source Code for the Software, and includes Documentation identifying developer's tools which tools are necessary for the complete understanding of the Source Code for the Software program.

1.48    "**Statement of Work**" means a statement of work as agreed between the Parties pursuant to the Development and Support Agreement.

1.49    "**Taxes**" means all present and future taxes, surtaxes, duties, levies, imposts, rates, fees, premiums, assessments, withholdings, dues and other charges of any nature imposed by any Governmental Authority (including income, capital, gross receipts, consumption, sales, use, transfer, goods and services or other value-added, excise, customs or other import and franchise), together with all fines, interest, penalties in respect thereof, or in lieu of or for non-collection thereof.

1.50    "**Term**" means as defined in Section 16.1.

1.51    "**Third Party**" means any person or entity other than Licensor and Licensee.

1.52    "**Third Party Software**" means any software used in or to operate the Licensed Products and supplied by a Third Party.

1.53    "**Trade Marks**" means those trade-marks set out on the attached <u>Exhibit D</u> hereto.

1.54    "**Warranty Period**" means as defined in <u>Exhibit C</u> hereto.

## Section 2:   GRANT OF LICENSES; INTELLECTUAL PROPERTY.

2.1     <u>Exclusive License Grant</u>.  Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee during the Term, an exclusive (except with respect to the Licensor Projects that are not transferred to Licensee pursuant to Section 9), royalty-bearing, non-transferable (except to its Affiliates located within the Exclusive Territory pursuant to Section 18.5), sublicensable (but only as set forth in Section 2.6), revocable (as set forth in Section 16), limited license, under the Licensed IP and Trade Marks, to (a) make, have made, use, offer for sale, lease, sell and otherwise dispose of Licensed Products only in the Exclusive Territory during the License Term, (b) pass on to End Users the right solely to use Licensed Products in the Exclusive Territory, and (c) to grant licenses with respect to the Licensed Software pursuant to a EULA in accordance with Section 3.

5

2.2 <u>Non-Exclusive License Grant</u>. Subject to the terms and conditions of this Agreement, upon delivery of Licensor's written consent as set forth herein Licensor hereby grants to Licensee during the Term a non-exclusive, royalty-bearing, non-transferable (except to its Affiliates located within the Exclusive Territory pursuant to Section 18.5), revocable (as set forth in Section 16), sublicensable (but only as set forth in Section 2.6), limited license, under the Licensed IP, to (a) make, have made, use, export, offer for sale, lease sell and otherwise dispose of Licensed Products outside of the Exclusive Territory; (b) pass on to End Users the right solely to use Licensed Products outside of the Exclusive Territory and (c) to grant licenses with respect to the Licensed Software pursuant to a EULA in accordance with Section 3; *provided, however*, such license will not be effective with respect to any Licensed Product until Licensor will have delivered Licensor's written consent to the licensing of such Licensed Product and the license granted hereunder with respect to such Licensed Product will be further subject to any restrictions and limitations contained in such written consent (including, without limitation, restrictions and limitations on territory, end customers, product specifications, etc.). Licensor may grant, deny or revoke such written consent on a case-by-case basis in its sole and absolute discretion, but will endeavor to respond to Licensee's request as soon as practicable. Any license granted pursuant to this section will only be effective in relation to the specific customer, territory or location referred to in Licensor's consent.

2.3 <u>Restriction on Licensor</u>: Except for the Licensor Projects not transferred to Licensee pursuant to Section 9, during the Term Licensor will not grant any licenses with respect to the Licensed Products or make, have made, import, use, offer for sale, market, lease, sell, export or otherwise dispose of the Licensed Products, the Licensed Software and related Source Code or Source Code Documentation or any part thereof in or to the Exclusive Territory or grant any license to any Third Parties to do the same.

2.4 <u>Construction of Claims</u>. If a judgment or decree is entered, which becomes final through the exhaustion of all permissible applications for rehearing or review by a superior tribunal, or through the expiration of the time permitted for such applications (hereinafter referred to as an "irrevocable judgment"), on the validity, scope, enforceability or priority of any claim or claims of any patent or patent application included in the Patent Rights in the Licensed IP, the construction placed upon any such claim or claims by such irrevocable judgment will be thereafter followed with respect to acts occurring thereafter. Without prejudice to the Licensee's other rights and remedies in this Agreement, if such irrevocable judgment holds all applicable claims in the Patent Rights in the Licensed IP are invalid or unenforceable so that no claims remain which cover the Licensed Product, Licensee will be relieved thereafter from payment of Royalties, License Fees and the Minimum Royalties, and from the performance of those other acts which may be required by this Agreement, but solely with respect to any affected Licensed Products sold or otherwise transferred after the date of such irrevocable judgment.

2.5 <u>Limitations</u>. The licenses granted to Licensee pursuant to this Agreement will be subject to the following limitations: (a) other than as set forth in Section 5, Licensee is not granted any other licenses with respect to the Licensed IP, including without limitation any license to research, design or develop any products, items or devices incorporating the Licensed IP or any Licensed Software; (b) Licensee may not modify or reverse engineer or engage any Third Party to modify or reverse engineer any Licensed Software, Licensed Products, Know-How or Deliverables or any Design Specifications or drawings relating thereto, except to the minimum extent that Licensor is required to permit such modification or reverse engineering under Isle of Man law; (c) Licensee's license to

6

make or have made Licensed Products is limited to the manufacture of Licensed Products in strict accordance with any and all drawings and other Design Specifications provided by Licensor to Licensee, including without limitation any modifications thereto as may be approved by Licensor in writing from time to time during the Term. Licensee shall be responsible for any and all acts by Third Parties on behalf of or at the direction of Licensee. Any such act by a Third Party that would result in a breach of any of the terms or conditions of this Agreement if such act had been undertaken by Licensee, shall constitute a breach by Licensee of this Agreement.

2.6 <u>Sublicensing</u>. Licensee will not sublicense of any rights granted hereunder without the express written consent of Licensor, which Licensor may grant or deny in its sole and absolute discretion; provided that Licensee may sub-license its rights to its Affiliates located within the Exclusive Territory. In the event that a sublicense is permitted under this Agreement, such sublicense will be subject and subordinate to the terms and conditions of this Agreement, and Licensee will remain responsible for all payments due to Licensor hereunder including those arising out of activities governed by any such sublicense. Licensee agrees, represents and warrants that all sublicenses hereunder will incorporate similar terms and conditions to this Agreement, including recordkeeping, reporting and royalty payment provisions that will permit Licensee to comply with its reporting and royalty payment obligations hereunder. Licensee may sell, lease or otherwise transfer products to End Users through one or more Third Party resellers, agents or distributors, provided that Licensee can show that such resellers, agents and distributors are not Competitors of Licensor.

2.7 <u>Sole Ownership</u>. Except in relation to a Licensee Improvement or as may be otherwise agreed in a Statement of Work, Licensor will own all right, title and interest in and to all Know-How and Patent Rights developed in connection with any Development Services (as defined below) or otherwise provided to Licensee during the term of this Agreement, including any derivative works thereof and any Improvements thereto, regardless of inventorship (as between the Parties and their Affiliates).

2.8 <u>Reports and Analyses</u>. Licensee will provide to Licensor, no more than once per Calendar Quarter, copies of any reports, summaries, test results or data, and cost, feasibility or other analyses prepared by Licensee relating to any Licensed Product, which copies will be deemed to be Confidential Information for purposes of Section 12 of this Agreement.

2.9 <u>Right of First Refusal</u>. During the Term, Licensor hereby grants Licensee the first right of refusal to act as the exclusive supplier of any New Products developed, licensed, acquired, or purchased by Licensor and its Affiliates, in the Exclusive Territory, as follows:

(a) <u>Notice</u>. If at any time during the Term, Licensor or its Affiliates decides (by a person or persons with authority within Licensor to make such a decision) that it will commence marketing, promoting, licensing, leasing, selling and/or otherwise transferring or providing (collectively, **"Commercializing"**) any New Product in the Exclusive Territory, Licensor will notify Licensee in writing in accordance with this Section 2.9, of such decision (**"New Product Notice"**) prior to Commercializing such New Product.

7

(b) <u>Delivery of Notice</u>. Licensor will deliver a New Product Notice to Licensee on the first occasion that, Licensor decides it wishes to commence Commercializing a New Product in the Exclusive Territory including a description of the terms pursuant to which Licensor would be in good faith willing to allow Licensee to commence Commercializing such New Product, which terms will, where reasonably possible (other than pricing and royalty terms, which shall be at Licensor's sole discretion), be similar to those for the licensing the Licensed Products pursuant to this Agreement.

(c) <u>Provision of Information</u>. Upon providing a New Product Notice to Licensee, Licensor will make available to Licensee all information and materials in Licensor's possession or control, including such information regarding the proposed New Product that would be generally viewed by persons skilled in the art of products of a similar type to those of the New Product as reasonably standard disclosure in Canada for the purpose of enabling Licensee to conduct due diligence and evaluate the New Product ("**Disclosure**").

(d) <u>Licensee's Response</u>. Within 15 Business Days after Licensee's receipt of the Disclosure, Licensee will provide Licensor with a written statement indicating whether or not it wishes to enter into an exclusive agreement for Commercializing the New Product in the Exclusive Territory upon those terms proposed to Licensee in the New Product Notice ("**Written Statement**").

(e) <u>No Response</u>. If Licensee does not provide to Licensor a Written Statement within such 15 Business Days or if Licensee, pursuant to its Written Statement, declines to enter into an agreement with Licensor under the proposed terms, then Licensor will be to engage Third Parties to or to itself commence Commercializing the New Product without any further obligation to Licensee under this Agreement.

(f) <u>Finalization Period</u>. For a period of 60 days from the date of Licensor's receipt of a Written Statement (a "**Finalization Period**") indicating Licensee's desire to enter into negotiations with Licensor for Commercializing the New Product, or such other period as the Parties may agree in writing, Licensor and Licensee agree to use their reasonable commercial efforts to negotiate exclusively and in good faith a written agreement ("**New Product Agreement**") to be entered into between the Parties for the Commercializing of the New Product.

(g) <u>Final Offer</u>. If, despite good faith negotiations, Licensor and Licensee cannot mutually agree upon the terms of the New Product Agreement by the end of the applicable Finalization Period, then Licensee may, in its sole discretion, present to Licensor, within ten days following the end of such Finalization Period, a final offer (a "**Final Offer**") with respect to all material terms of such New Product Agreement. If Licensee does not present a Final Offer to Licensor within such ten day period, then Licensor will be free to engage Third Parties to or to itself commence Commercializing the New Product without any further obligation to Licensee under this Agreement.

(h) <u>Final Acceptance Period</u>. If Licensee presents a Final Offer within such ten day period, and Licensor, acting reasonably, rejects the Final Offer within three Business Days of its receipt of the Final Offer (a "**Final Acceptance Period**"), or

*DOCS #1293613 v. 3*

Licensor fails to respond to the Final Offer within such Final Acceptance Period, Licensor will thereafter be free following the end of the Final Acceptance Period to engage Third Parties to or to itself commence Commercializing the New Product without any further obligation to Licensee under this Agreement.

(i) <u>Restricted Period</u>. For a period of 12 months (**"Restricted Period"**) following the making of any Final Offer, Licensor will be restricted from entering into any agreement with any Third Party in respect of Commercializing the New Product in the Exclusive Territory unless the terms of such agreement with any Third Party are more favourable in the aggregate to Licensor than those presented to Licensee by Licensee in the applicable Final Offer, as determined in a confidential review by a mutually agreeable arbitrator with such industry experience as is necessary to make such a determination pursuant to Section 18.3.

(j) <u>Expiry of Restricted Period</u>. Upon the expiry of any Restricted Period, Licensor will have no obligation to Licensee under this Section 2.9, including without limitation, Licensor shall be free to enter into agreements with any Third Parties or to itself commence Commercialization of the New Product that was described in the applicable Final Offer without any restrictions or further obligation to Licensee under this Agreement.

## Section 3: SOFTWARE.

3.1 <u>Software Licenses and Installation</u>. From time to time during the Term, Licensee will sell, lease or otherwise transfer to its End Users Licensed Products which require the Licensed Software in order to operate. Licensee is hereby granted a non-exclusive, limited, royalty free, revocable (as set forth in Section 16), non-transferrable (except to its Affiliates located within the Exclusive Territory pursuant to Section 18.5) license to (a) have Licensor or its Affiliates install the Licensed Software on the applicable Licensed Products and (b) sublicense to End Users who purchase applicable Licensed Products the right to use the Licensed Software solely for the operation of the applicable Licensed Products, provided such End User will have executed and delivered to Licensee an end user license agreement substantially in the form set out in <u>Exhibit F</u> hereto ("EULA"). Licensee is not granted any other license to sell, lease or otherwise transfer to any Third Party any Licensed Software pursuant to this Agreement. In the event that Licensee or any of Licensee's Affiliates, distributors, agents or resellers will desire to use any Licensed Software for its own purposes as an End User (for demonstration purposes or otherwise), Licensee or its applicable Affiliates, distributors, resellers will enter into an EULA with Licensor and will be deemed an End User with respect thereto. In the event that Licensee will have failed to obtain an End User's agreement to the terms of an EULA, Licensee will be liable to Licensor for any act by such End User which would have resulted in a violation of an EULA, had such agreement been obtained. No license is or will be granted hereunder by Licensor with respect to any Open Source Material or Third Party Software for which Licensor does not have a right to provide a sublicense. Licensor will not incorporate into any Licensed Product designs delivered to Licensee any Open Source Material or Third Party Software for which Licensor does not have a right to provide a sublicense without obtaining Licensee's prior written consent.

3.2 <u>Enforcement of EULAs</u>. In the event that Licensor will have a good faith belief that any Third Party who has obtained any Licensed Software from Licensee, either directly or indirectly through one or more of Licensee's resellers, distributors, agents or Affiliates, is

in violation of the terms of the EULA (or has failed to execute an EULA), Licensee will, upon Licensor's reasonable request which shall include a summary of Licensor's basis for its good faith belief, contact the Licensed User to seek to remedy the deficiency. In the event that the Licensee is unable to remedy the deficiency directly with the Licensed User within a reasonable period of time the Licensee will file any such suits, bring any such actions and do all other acts and file such other documents, as Licensor may deem reasonably necessary in accordance with applicable law to enforce the EULA or to enforce, protect or preserve Licensor's rights in and to the Licensed Software. Licensor will; (a) be entitled to control all aspects of such action, including the right to enter into any settlement, consent judgment or other voluntary final disposition respecting such action; (b) bear all costs, losses and damages and attorneys' fees attributable to Licensee respecting such action and any counterclaim (except to the extent that Licensee may elect to be represented by independent counsel in such action, in which case such independent counsel costs and fees will be at Licensee's own expense); and (c) be entitled to all litigation or settlement recoveries received (including all amounts received under any applicable license or sublicense agreement(s) entered into between the Third Party and Licensor). Licensee will provide reasonable cooperation and assistance and will execute such legal papers and perform any other acts relating to prosecution of such action as may be reasonably requested by the Licensor, at Licensor's cost.

3.3 Licensed Software Warranty. Licensor will provide the warranty set forth on Exhibit C with respect to the Licensed Software.

## Section 4: TRADE MARK LICENSE.

4.1 License. Subject to the terms and conditions set out herein, the Licensor hereby grants to the Licensee a limited, non-exclusive right to market under and use the Trade Marks in association with the Licensed Products, including but not limited to any product that is sold under the Licensed IP or that uses the Know-How in the Exclusive Territory and in any territory for which Licensor has consented to a license pursuant to Section 2.2; *provided, however*, Licensee will comply with any of Licensor's reasonable written policies with respect to the use of the Trade Marks, as may be provided to Licensee from time to time.

4.2 Goodwill. The Licensee and its sub-licensees acknowledge that the Licensor is the exclusive owner of the Trade Marks and that all goodwill deriving from the use thereof will inure to the benefit of the Licensor.

4.3 Domain Names. The Licensee and its Affiliates will not, without the prior written consent of the Licensor, register any domain names that are based in whole or in part on the Trade Marks. From the Effective Date the Licensee will be permitted to operate under the domain names wtecanada.ca and wtecanada.com.

4.4 Trade Mark Application. To the extent that the Trade Marks have not been applied for in the Exclusive Territory as at the Effective Date, the Licensor will submit trade mark applications for the Trade Marks as soon as possible, and in any event within 30 days of the Effective Date.

10

## Section 5: IMPROVEMENTS.

5.1 <u>Improvements</u>. Licensee is restricted under Section 2.5 from performing any research or development activities covered by the Licensed IP, *provided, however* for the avoidance of doubt, Licensee shall not be restricted from researching or developing any Licensee Improvements. The foregoing will not be construed as a granting a license to Licensee to reverse engineer any Licensed Product, to disassemble any component of a Licensed Product, or to modify the design of any Licensed Product.

5.2 <u>Licensor's Notice of Improvements</u>. In the event that Licensor has developed a Licensor Improvement to a Licensed Product, which Licensor Improvement Licensor intends to make generally available to its Affiliates, End Users or licensees, Licensor will provide notice of such Licensor Improvement to Licensee and an opportunity for Licensee to license such Licensor Improvement on terms and conditions mutually acceptable to the Parties, subject to and in accordance with Section 5.3.

5.3 <u>Licensor Improvements</u>. Licensor will grant to Licensee for the Term with respect to those Licensor Improvements which Licensor makes available to its customers generally without charge, a full-paid, non-exclusive license, to make, have made, use, offer for sale, lease sell and otherwise dispose of products and devices incorporating such Licensor Improvements, with a right to sublicense to Licensee's Affiliates in accordance with Section 2.6.

5.4 <u>Technical Records and Reporting</u>. The Parties each agree to keep and to cause each of their Affiliates to keep proper reports and records of the technical documentation relating to their Intellectual Property Rights and Improvements, in particular, the names of the inventors and all assignments of their applicable inventions.

5.5 <u>Improvements Involving Third Parties</u>. In any instance where Licensor is an owner but not the sole beneficial owner of a Licensor's Improvement to which Licensee is entitled to receive a license pursuant to this Section 5, Licensor will use all reasonable endeavors to obtain the consent of all Third Parties having an interest in the Licensor Improvement to allow Licensor to perform its obligations as stipulated in this Section 5. If such consent is not given, such obligations will not be enforceable against such Licensor and the Licensee will have no claim for non-performance thereof.

5.6 <u>Assignment of employees/contractors</u>. The Licensor will cause its Personnel (and the employees of its sub-licensees) or other persons under its control, including its independent contractors and agents, to assign any and all right, title and interest that they may have in any Licensor Improvement to Licensor as soon as such rights come into existence under the laws of the jurisdiction in which they are or could be acquired, but only to the extent that Licensor has the right to do so under agreements with such sub-licensees, contractors or agents with respect to such Improvement.

5.7 <u>Ownership of Independently Developed Invention</u>. For the avoidance of doubt, in the event that the Licensee, or one of its Affiliates, invents anything that relates to gasification technology designed to convert municipal solid waste, biomass and other solid waste streams, which is not based on or derived in any manner from the Licensed IP and would not be subject to restriction under the Licensed IP (without regard to the licenses granted to Licensee pursuant to this Agreement) ("**Invention**"), it being understood that the base technology for gasification is not generally proprietary to the

11

Licensor, the Licensee or the applicable Affiliate will be the owner of such Invention and any patents relating thereto; *provided, however,* Licensee shall not during the Term without first terminating this Agreement pursuant to Section 16.5 or 16.6, market, license, sell or otherwise transfer any products incorporating such an Invention, which is competitive with the Licensed Products of the Licensor, without Licensor's prior written consent. For the purposes of this Section 5.7 a Licensee product incorporating an Invention will be deemed to be competitive with a Licensed Product if a reasonable person would consider that a customer could choose such product in lieu of a Licensed Product. Any dispute over this Section, including whether a Licensee's product is competitive, will be dealt with in accordance with the dispute resolution procedures in Section 18.3 of this Agreement.

## Section 6: ENFORCEMENT.

6.1    Prosecution of Infringers.  If Licensee determines that a Third Party is infringing the Licensed IP or Trade Marks by making, using or selling a product in the Exclusive Territory which competes with a Licensed Product then being sold by Licensee, it will notify Licensor thereof in writing. Such notice will include information in Licensee's possession relevant to such Third Party and the competing product. Licensor will respond to Licensee within fifteen (15) days of Licensee's notice and provide details of Licensor's plan for tackling the alleged infringement. Licensor will have ninety (90) days from the date of the Licensee's original notification in which to (a) obtain the consent of such Third Party to discontinue such infringement, (b) to exercise its right to bring an action to cause such infringement to cease or (c) provide written notice to Licensee indicating that it will not seek to enforce the Licensed IP or Trade Marks because it has a good faith belief that to do so would result in a material adverse effect to its business, prospects or reputation. Licensor will have no obligation to bring an action for infringement; *provided however,* if Licensor does not either obtain the consent of such Third Party to cease infringement or bring suit against the Third Party under the patent and Licensor has failed to timely provide notice of the aforementioned good faith belief, then Licensee will have the right, but not the obligation, to institute and control an action in the Exclusive Territory, in its name and at its sole expense, against such Third Party for infringement of any Licensed IP or Trade Marks.

6.2    Action: Recovery.  The Party initiating and controlling an infringement action against a Third Party will be entitled to control all aspects of such action, including the right to enter into any settlement, consent judgment or other voluntary final disposition respecting such action; provided that no settlement will be entered into by Licensee without the written consent of the Licensor, which consent will not be unreasonably withheld, if such settlement would materially affect the Licensee's rights or interests, (a) bear all costs and attorneys' fees respecting such action (except to the extent the other Party may elect to be represented by independent counsel in such action, in which case such independent counsel costs and fees will be at such other Party's own expense), and (b) be entitled to all litigation or settlement recoveries received (including all amounts received under any applicable license or sublicense agreement(s) entered into between the Third Party and the Party initiating and controlling such action). In the event that the Parties determine acting in good faith that the infringement results in a material adverse effect to Licensee and Licensee properly controls an infringement action pursuant to Section 6.1, if, after receiving all settlements or awards resulting from such action, the Licensee is still out of pocket, the Licensor will pay to the Licensee the difference between the settlement or award received and the amount outstanding. Each Party will provide reasonable

12

cooperation and assistance and will execute such legal papers and perform any other acts relating to prosecution of such action as may be reasonably requested by the Party bringing such action, at the expense of the Party bringing suit.

## Section 7: PROTECTION OF INTELLECTUAL PROPERTY; ESCROW.

7.1 <u>Maintenance of Rights</u>. The Licensor will be responsible for and will use its best efforts during the Term to obtain rights in the Licensed IP and Trade Marks and maintain such rights (including their rights in any related Know-How only to the extent reasonably, commercially and legally practicable) in full force and effect in the Exclusive Territory. If the Licensor is of the view that it is commercially, financially or legally unable to maintain the rights to the Licensed IP and Trade Marks, it will notify the Licensee and provide reasons in advance of any filing deadline, and grant the Licensee the opportunity and right to take all reasonable steps with the Licensor's reasonable assistance to preserve and maintain the rights. Any cost actually incurred by Licensee will be offset against payments due to Licensor under this Agreement. All filing, prosecution and renewal fees and other costs and expenses in connection with obtaining and maintaining the applicable Intellectual Property Rights will be promptly paid by the Licensor with respect to the Licensed IP, Trade Marks and Licensor Improvements, provided that if the Licensor will refuse or neglect to pay any such fees, costs or expenses, the Licensee may pay the same and recover the cost from the Licensor. The Licensor will also at its expense take all such reasonable steps as may be appropriate to procure such extensions of the term of the applicable Licensed IP and Trade Marks as it may be reasonably, commercially and legally practicable to obtain.

7.2 <u>Notification of Filing</u>. Each Party agrees to notify the other Party within thirty (30) days of the date upon which it or any one of its Affiliates makes an application for or acquires any Intellectual Property Rights for which the other Party will be entitled to a license pursuant to this Agreement, including for the avoidance of doubt any patent filings in territories in which the Licensee has been granted rights pursuant to Section 2.2. Such notice to include the expiration dates of any period during which a related application with respect to such Intellectual Property Rights must be filed in the Exclusive Territory or in the territory in which the Licensee has been granted rights pursuant to Section 2.2. Nothing in this Agreement shall be construed as requiring Licensor to file for the protection of any Intellectual Property Rights that Licensor prefers to retain as a trade secret, therefore, the provisions of this Section 7.2 shall only apply to those Intellectual Property Rights for which Licensor has elected to make an original filing for such protection.

7.3 <u>No abandonment</u>. The Licensor will not abandon any Licensed IP, or any Trade Mark or related, trade-mark right, trade-mark application, or right to file for Intellectual Property Rights protection within the Exclusive Territory relating to the Licensed Products, without the prior written consent of the Licensee. In the event that Licensor chooses to abandon its rights in and to any Licensed IP and Trade Marks outside of the Exclusive Territory, approved by the Licensor pursuant to Section 2.2, it will notify the Licensee in sufficient time prior to any filing dates and grant the Licensee the opportunity and right to take all reasonable steps, at Licensee's sole cost to preserve and maintain such rights and Licensor will provide the Licensee with reasonable assistance to ensure the maintenance and, if applicable, assignment of such rights, as may be reasonably required, at Licensee's reasonable cost.

13

7.4  Registration as Licensee. Where permitted by applicable law, Licensee may register as a licensee of any of the Licensed IP and Trade Marks in the Exclusive Territory, and in any territory outside of the Exclusive Territory where it is granted rights pursuant to Section 2.2, and the Licensor will assist the Licensee in effecting such registration.

7.5  Escrow. Licensor will deposit: (a) on the Effective Date the Source Code Documentation for the Licensed Products; (b) on the Effective Date the Design Specifications, technical drawings, specifications, Know-How to the extent reproducible, control codes and any other Documentation related to the Licensed Products; and (c) within thirty (30) days of being made available to any of the Licensor's Affiliates, End Users or licensees, any Enhancements for the Licensed Software for the Licensed Products which are licensed to Licensee pursuant to this Agreement and any updates to that Documentation referred to under Section 7.5(a) and (b); including without limitation, any updates from time to time, necessary to build, operate, support and enhance the Licensed Products and the Licensed Software contained therein ("**Escrow Material**"), in escrow with an escrow agent pursuant to an escrow agreement of the same date as this Agreement ("**Escrow Agreement**"). All Escrow Materials will at all times be deemed Confidential Information for the purpose of this Agreement.

7.6  Release from Escrow.

   (a)  Definitions.

      (i)  "**Critical Defect**," "**Major Defect**" and "**Minor Defect**" have the meanings ascribed to them in Exhibit A to the Development and Support Agreement. "**Service Provider**" means Waste2Energy, Inc., an Affiliate of Licensor.

      (ii)  "**Release Conditions**" shall mean:

         (A)  Licensor and Service Provider have each ceased to do business as a going concern and no successor(s) has(have) been appointed; or

         (B)  (i) Service Provider, Licensor and their Affiliates have not responded to Licensee's request for service on a Critical Defect or Major Defect within 48 hours from receipt of such request, (ii) Licensee has thereafter sent written notice of its intent to seek a release of the Escrow Materials from escrow to Service Provider and Licensor and (iii) Licensor has failed to respond to such notice of intent within a further 5 Business Days from receipt of such notice of intent; or

         (C)  (i) Service Provider, Licensor or any of their Affiliates has responded to each of the requests and notices described in subsection (B) above and Service Provider, Licensor and their Affiliates have failed to commence and diligently pursue within 5 Business Days of the expiration of Licensor's applicable response period as set forth above, such actions as are necessary to remedy the claimed Critical Defect or Major Defect, (ii) Licensee has thereafter sent written notice of its intent to seek a

14

release of the Escrow Materials from escrow to Service Provider and Licensor, and (iii) Service Provider, Licensor and their Affiliates have not commenced and continued to diligently pursue actions as may be reasonably necessary to remedy such Critical Defect or Major Defect within 2 Business Days from such notice (for avoidance of doubt, failure of a Third Party to deliver services or parts necessary to remedy a defect shall not be deemed a failure to diligently pursue the obligation to remedy a defect).

(iii)    **"respond"** or **"responded"** with respect to Licensor, Service Provider and their Affiliates means to provide an initial response to Licensee's request for service by telephone, in person or via email that acknowledges receipt of the request for assistance and provides a timeline to develop an action plan within the applicable time period.

(iv)    For purpose of this Section, actions "necessary to remedy a defect" include without limitation, any actions taken within the applicable time period by Licensor or Service provider in furtherance of formulating a plan to remedy the defect, coordinating with Licensee to implement any such plan, and taking any actions to implement such plan.

(b)    Release.  The Escrow Material will be made available to Licensee under the Escrow Agreement in the event that one or more Release Conditions shall have occurred and remain unremedied at the time of the release; *provided, however,* only those portions of the Escrow Material which relate specifically to the Licensed Product (e.g. sBOS™, cBOS™ or COR™) and the End User for which such Release Conditions exists will be released to Licensee, except in relation to a release pursuant to Section 7.6(a)(ii)(A) whereby all Escrow Material shall be released.  In the event of any such release, Licensor grants to Licensee a non-exclusive, non-transferable (except to its Affiliates located within the Exclusive Territory pursuant to Section 18.5), revocable (as set forth in Section 16), sublicensable (but only as set forth in Section 2.6), limited license, under the Licensed IP and Licensed Software, to use the released Escrow Materials to for the purpose of providing to the End Users for which the Release Condition occurred, those Support Services (as defined in the Development and Support Agreement) which Service Provider has failed or become unable to perform under the Development and Support Agreement, any Statement of Work or other agreement between Licensor, Licensee or End User relating to the provision of Support Services by Licensor, Service Provider or their Affiliates, such that any ongoing Statements of Work and any related agreements and Projects with End Users can be completed and Projects supported in accordance with their terms. Notwithstanding anything to the contrary in this Agreement or the Escrow Agreement, Licensor agrees that the terms of the Escrow Agreement or any future escrow agreement under which Licensee is a beneficiary or a Party, will, at a minimum, contain the Release Conditions as specified in this Section 7.6.  All costs of the escrow arrangement that apply only to Licensor as depositor will be borne by Licensor, all costs of the escrow arrangement that apply only to Licensee as beneficiary will be borne by Licensee and all costs of the escrow arrangement that apply to all beneficiaries of such escrow arrangement generally will be borne equally by Licensor, Licensee and such other beneficiaries.  In the

15

event that Licensee will at any time be in default of its payment obligations with respect to the escrow arrangement, Licensee will not be entitled to a release of any Escrow Material thereunder and Licensor, in its sole discretion, may make payments of any such obligations and obtain reimbursement from Licensee. If the Licensor is at any time in default of its payment obligations in respect of the Escrow Agreement Licensee may, after providing thirty (30) days prior written notice thereof and an opportunity to cure, make payment of such obligations on behalf of Licensor and deduct any amount actually paid by Licensee from any amounts owed by Licensee to Licensor pursuant to this Agreement. Any dispute as to whether the conditions necessary to require a release of the Escrow Materials under this Section 7.6 shall have been satisfied shall be resolved in accordance with the dispute resolution procedures in Section 18.3 of this Agreement prior to any release of such Escrow Materials.

7.7   <u>Continuation of Rights</u>. If Licensor commits an Act of Insolvency and this Agreement is not terminated by Licensee, then Licensee may nevertheless retain all license rights granted under this Agreement to the maximum extent allowed by, and in accordance with, applicable law, irrespective of whether a debtor-in-possession or trustee-in-bankruptcy rejects or disclaims this Agreement.

## Section 8: PRODUCT DATA AND REGISTRATIONS.

8.1   <u>Registrations</u>. With respect to Licensed Products which Licensee or its Affiliates are licensed pursuant to the license grants in Sections 2.1 and 2.2 hereof, the Licensee is authorized to apply for and maintain registrations (e.g. C.E. or U.L. listing or the substantial equivalent) for the Licensed Products in any jurisdiction in which it is authorized pursuant to this Agreement, worldwide and any such registration may be applied for and held in the name of the Licensee. To aid the Licensee in applying for, obtaining and upholding such registrations, the Licensor hereby grants to the Licensee and its Affiliates the right, free of charge, for this purpose, to access, to cite and rely on any data available to the Licensor or its Affiliates, including data submitted by the Licensor and its Affiliates in connection with any Licensed Product residing in the files of any federal, state, provincial or local regulatory authority. Any costs relating to any Product registration described under this Section 8.1 will be borne by the Licensee and Licensee will reimburse Licensor for any reasonable, out of pocket costs or expenses incurred by Licensor or its Affiliates as a result of its compliance with this Section 8. The Licensee will notify the Licensor of any label requirements arising from the registration of any Product in a jurisdiction other than Canada in which the Licensee or its Affiliate intends to exploit the Licensed Products.

8.2   <u>Exclusive Ownership of Data</u>. Licensor will periodically make available to its licensees generally and Licensee will collect from its End Users, certain aggregated data that are collected regarding the performance and maintenance of Licensed Products, which data will not include any personally identifying information regarding the owner or user of the Licensed Products or any information which would violate any rights of or obligations of the applicable Party to any Third Parties ("**Global Information**"). Data generated by the Licensor or its Affiliates at their own expense to obtain or support any Licensed Product or any Product registrations will at all times be and remain the exclusive property of the Licensors or their Affiliates, but Licensee and its Affiliates will have the right during the Term to cite Global Information without charge for any purpose in connection with the registration or sale of any Licensed Product as permitted under this Agreement.

16

Data generated by the Licensee or its Affiliates at its own expense to obtain or support any Licensed Product registration or the sale of any Licensed Product will at all times be and remain the exclusive property of the Licensee or its Affiliates, but during the term hereof the Licensor or their Affiliates will have the right to cite such data, without charge, for any use in connection with the registration or sale of any Licensed Products as permitted under this Agreement.

8.3     <u>Joint Development of Data</u>. In the event that the Parties should decide to jointly develop data to obtain or support any registrations necessary or desirable for the sale of any Licensed Product, the ownership of, and rights to, such data will be as agreed upon in writing by the Parties. At the request of the Licensee, and without the payment of consideration (except the payment of reasonable out of pocket costs and expenses incurred by the Licensor or its Affiliates in implementing such request), the Licensor will permit the Licensee or their Affiliates to obtain supplemental or "me-too registrations" respecting any registration that the Licensors may have in any jurisdiction respecting any Licensed Product.

## Section 9: TRANSFER OF LICENSOR PROJECTS.

9.1     <u>Rights Retained by Licensor.</u> The Parties acknowledge that Licensor is engaged in those projects and activities described on <u>Exhibit E</u> hereto (the "**Licensor Projects**") within the Exclusive Territory, which Licensor reasonably considers are in specified cases projects capable of being adopted by Licensee pursuant to this Section 9. Certain of the Licensor Projects have been listed under the heading "Contingent Projects" on such <u>Exhibit E</u>. Licensor and Licensee will develop a joint letter of introduction, on terms to be agreed, to be sent to the deal leads of each of such Contingent Projects introducing Licensee as the new representative of Licensor in the Exclusive Territory. With the intent of transferring all of such Contingent Projects to the Licensee, the Licensor will endeavor to provide to Licensee, subject to any confidentiality agreements in place with each party, full details of each such Contingent Project, as known by the Licensor, and contact details for the deal leads. If Licensee enters into a good faith letter of intent or heads of agreement for a Contingent Project on or prior to a date which is 30 days from the Effective Date and such letter of intent is not terminated prior to completion, Licensor will cease to deal with such Contingent Project and Licensee will, within the scope of engagement for such Contingent Project, engage with each party based on a timeframe to be set by Licensee for each Contingent Project, subject to any time period in Section 9.2.

9.2     <u>Contingent Projects</u>. Anything to the contrary notwithstanding, other than any such Contingent Projects for which Licensee has entered into a binding agreement prior to the date which is 90 days from the Effective Date, which agreement is not terminated prior to the consummation of the transactions contemplated therein, Licensor may pursue and perform the Licensor Projects without consideration to Licensee and Licensor retains all rights in and to its Software, Patent Rights and Know How and Documentation, may exercise any and all rights with respect to, and may develop, make, use, offer for sale and sell any process, item, service, work, device, component, contrivance, machine, instrument, apparatus, implement, equipment, technology or other product or component thereof, incorporating any such Software, Patent Rights or Know How, (i) inside the Exclusive Territory solely with respect to the Licensor Projects and (ii) outside the Exclusive Territory without limitation.

17

**Section 10: MANUFACTURING RIGHTS.**

10.1 <u>Design Specifications</u>. Licensee and its Third Party sub-contractors will manufacture the Licensed Products solely in strict accordance with the Design Specifications, including without limitation any modifications thereto as may be approved by Licensor in writing from time to time during the Term.

10.2 <u>Right of Supervision</u>. Licensee will provide and will cause its Third Party sub-contractors to provide access to Licensor upon reasonable notice to Licensee and Licensee's sub-contractors' premises, during standard business hours, as applicable, to inspect Licensee's and Licensee's sub-contractors' manufacturing of Licensed Products.

10.3 <u>Non-compliance</u>. In the event that Licensor will determine acting in its reasonable discretion and in good faith that any Licensed Products are not being manufactured in accordance with the terms of the Design Specifications or Licensee or any of its Third Party sub-contractors acts in a manner resulting in a material adverse effect to Licensor's business or prospects, including without limitation any adverse effect to Licensor's reputation, goodwill or to Licensor's customers' or prospective customers' perception of Licensor, Licensor will notify Licensee of such determination providing a description of the non-compliance, a statement of its basis for making such determination, and providing its recommendations, if any, for remedying the non-compliance. Within 15 days of Licensee's receipt of such notice, Licensee will deliver to Licensor a detailed written plan for the resolution of such non-compliance reasonably satisfactory to Licensor. If after 20 Business Days following receipt of Licensee's plan for resolution of such non-compliance the Licensor reasonably determines following a further inspection that such non-compliance has not been remedied, Licensor will again notify Licensee of such determination providing a description of the non-compliance, a statement of its basis for making such determination, and providing its final recommendations. If after 20 Business Days following receipt of Licensor's second notification the Licensor reasonably determines following a further inspection that such non-compliance has not been remedied, the Licensor may at its option suspend the licenses granted hereunder in relation to the manufacture of the non-conforming Licensed Product until such time as Licensor has determined in its reasonable discretion that Licensee and Licensee's sub-contractors have corrected such non-compliance. The foregoing notwithstanding, if after 40 Business Days following receipt of Licensor's second notification the Licensor reasonably determines following a further inspection that such non-compliance has not been remedied, Licensor may terminate the impacted Statements of Work if the non-compliance is limited to specific Statements of Work or this Agreement if the non-compliance impacts all Statement of Work under this Agreement, pursuant to Section 16.2. Any dispute as to whether a non-compliance exists or has been remedied will be referred for resolution pursuant to Section 18.3.

**Section 11: PAYMENTS.**

11.1 <u>License Fees</u>.

(a) <u>License Fee</u>. During the Term and subject to the receipt of a valid invoice, Licensee will pay to Licensor a license fee (the **"License Fee"**) (exclusive of Taxes) in the amount of $2,000,000.00. Such Licensee Fee will be paid as follows:

18

(i) $250,000 on the Effective Date;

(ii) $250,000 six months after the Effective Date; and

(iii) three installments of $500,000.00 payable on the first, second and third anniversary of the Effective Date of this Agreement.

(b) <u>Royalties</u>. Subject to Section 11.1(c) below, Licensee will pay to Licensor royalties (the "**Royalties**") (inclusive of Taxes) in accordance with <u>Exhibit A</u> to this Agreement.

(c) <u>Minimum Royalties</u>. During the Term, the minimum Royalties (inclusive of Taxes) that will be due and payable by Licensee, pursuant to this Agreement will be as set forth on <u>Exhibit B</u> to this Agreement (the "**Minimum Royalties**").

(d) <u>Payment of Royalties</u>. Unless otherwise agreed by the Parties in writing, upon installation of any Licensed Software, Licensor shall make a partial progress payment towards the total Royalties due for such Project in an amount equal to the pro rata portion of the total Royalties due for such Project based upon the ratio of (i) the gross revenue (excluding Taxes where the contract amount agreed with an End User is stated to be exclusive of such Taxes) received from all sources by the Licensor or any of its distributors, resellers, agents of Affiliates arising out of such Project to (ii) the aggregate amount to be received from all sources by the Licensor or any of its distributors, resellers, agents of Affiliates arising out of such Project (excluding Taxes where the contract amount is stated to be exclusive of such Taxes). Such progress payment shall be due and payable within 30 days of Licensor's (or its distributors', resellers', agents' or Affiliates') receipt of Licensor's invoice therefore, with the balance of all Royalties due for such Project to be paid within thirty (30) days of the Completion of such Project. The Parties acknowledge and agree that the Royalties are payable in consideration of the licenses granted to Licensee under Licensor's Patent Rights and that such royalty rates are a reasonable approximation of the value of such consideration.

(e) <u>Payment of Minimum Royalties</u>. Minimum Royalties, if applicable, will become due and payable within thirty (30) days following the end of the applicable twelve month period for which they are due.

(f) <u>No Contingent Royalties</u>. Payment of Royalties will not be contingent upon payment by the End User. Anything to the contrary notwithstanding, the entire amount of the Royalties due with respect to a Project will be paid in full within forty five (45) days of Completion.

(g) <u>Royalty Reports; Records</u>. Within thirty (30) days after the end of each Calendar Quarter during the Term, Licensee will furnish to Licensor a written report with respect to all Licensed Products sold, leased or otherwise transferred by Licensee and its Affiliates, resellers and distributors during such Calendar Quarter: (a) listing all accrued Royalties during such period; and (b) providing in reasonably specific detail all information as may be reasonably necessary for Licensor to calculate the Royalties due for such period (including without limitation any exchange rates, if any, used in determining the amount payable to Licensor in

19

United States dollars). Licensee will keep, and will cause its sub-licensees and their respective Affiliates, resellers and distributors to keep accurate records in sufficient detail to enable the Royalties payable to be determined.

(h) <u>Licensor's Audit</u>. Upon the written request of Licensor and not more than once in each calendar year, Licensee and its Affiliates will permit an independent certified public accounting firm of nationally recognized standing, selected by Licensor and reasonably acceptable to Licensee, at Licensor's expense, to have access during normal business hours to such of the records of Licensee and its Affiliates as may be reasonably necessary and solely related to this Agreement to verify the accuracy of the Royalty reports hereunder for any year ending not more than thirty-six (36) months prior to the date of such request. Unless disputed by Licensee or Licensor, if such accounting firm concludes that the Royalties paid during the audited period were more or less than the Royalties due, Licensee will pay any additional Royalties due, and Licensor will refund any royalties overpaid, within thirty (30) days after the date the written report of the accounting firm so concluding is delivered to Licensor and Licensee. The fees charged by such accounting firm will be paid by Licensor; *provided, however,* that if the audit discloses that the Royalties payable by Licensee for such period have been underpaid by more than five percent (5%), then Licensee will pay the reasonable fees and expenses charged by such accounting firm.

(i) <u>Licensee's Audit</u>: Upon at least forty-eight (48) hours prior written notice, to be exercised no more frequently than once in each calendar year, the Licensor will permit an independent consultant of nationally recognized standing (that has entered into a confidentiality agreement on terms that are no less restrictive than those contained herein), selected by Licensee and reasonably acceptable to Licensor, at Licensee's expense, to have access during normal business hours to such of the records of the Licensor and its Affiliates as may be reasonably necessary and solely related to this Agreement to ensure compliance with Section 7 of this Agreement. The Licensor will make available (or cause to be made available) to the Licensee or such auditor, as applicable, any records, documents and information that may be required and allow copies to be made and taken away. All material obtained during such an audit will be kept in confidence by the consultant and pursuant to a confidentiality agreement no less favorable to Licensee than the provisions of Section 12.

(j) <u>USD</u>: All sums set out in this Agreement are in United States Dollars.

11.2 <u>Payment Method; Currency</u>. All payments by Licensee to Licensor hereunder will be in United States dollars in immediately available funds and will be made by wire transfer to an account in a United States bank designated by Licensor to Licensee. For the purpose of calculating Royalties, revenues received by Licensee with respect to Licensed Products in a currency other than United States Dollars will be expressed both in the currency in which the amount is invoiced and in the United States Dollar equivalent. The United States Dollar equivalent will be determined as of the event giving rise to each applicable payment in a manner reasonably acceptable to the Parties.

11.3 <u>Overdue Payments</u>. All overdue payments hereunder will accrue interest at the rate of one and one-half percent (1.5%) per month, or the highest rate permitted by applicable law, whichever is less. The payment of interest on overdue amounts will be in addition to

20

any other remedies that may be available to Licensor hereunder or at law on account of Licensee's failure to make payments in accordance with the terms of this Agreement.

11.4 <u>Disputed Amounts</u>. Licensee will provide Licensor prompt notice of amounts that Licensee disputes in good faith (including an amount for which payment has been previously made) within forty-five (45) days of receipt of invoice (or promptly upon becoming aware of such dispute for a previously paid amount). In such circumstances, the Parties will promptly meet and will attempt in good faith to resolve any such dispute promptly. If the dispute cannot be resolved by the Parties within thirty (30) days of notification by Licensee, such dispute will be escalated for resolution pursuant to the dispute resolution procedures in Section 18.3 of this Agreement and that process will determine whether the disputed charges will be paid by Licensee.

11.5 <u>Withholding Tax</u>. Notwithstanding any other provision of this Agreement, Licensee will be entitled to withhold from all fees payable to Licensor under this Agreement all applicable Taxes required to be withheld by any applicable Laws and to remit same to any applicable Governmental Authority as required by Law. Any amounts so withheld and remitted will be deemed to have been received by the Licensor in respect of such fees payable under this Agreement.

**Section 12: CONFIDENTIALITY AND NON-CIRCUMVENTION.**

12.1 <u>Confidentiality</u>. Each Party (the "**Receiving Party**") understands that the other Party (the "**Disclosing Party**") has disclosed or may disclose Confidential Information to the other Party as part of performing its obligations under this Agreement.

12.2 <u>Covenant</u>. The Receiving Party agrees, except as expressly set out in this Agreement:

    (a) to hold the Disclosing Party's Confidential Information in confidence and to take all necessary precautions to protect such Confidential Information (including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials);

    (b) not to divulge any such Confidential Information or any information derived therefrom to any Third Party;

    (c) not to make any use whatsoever at any time of such Confidential Information except to perform its obligations under this Agreement;

    (d) not to copy or reverse engineer, reverse compile or attempt to derive the composition or underlying information of any such Confidential Information without written permission from the Disclosing Party.

12.3 <u>Limits on Disclosure</u>. The Receiving Party will limit the use of and access to the Disclosing Party's Confidential Information to the Receiving Party's Personnel and Affiliates who need to know such Confidential Information for the purpose of performing its obligations under this Agreement and will cause such Personnel to comply with the obligations set forth herein. The Receiving Party will treat the Confidential Information with at least the same degree of care and protection, as it would use with respect to its own Confidential Information.

21

12.4    Exclusions. The Disclosing Party agrees that the term "Confidential Information" will not include information that:

(a)    is in the public domain and is available at the time of disclosure or which thereafter enters the public domain and is available, through no improper action or inaction by the Receiving party or any affiliate, agent or employee;

(b)    was rightfully disclosed to it by another person without restriction;

(c)    is established by evidence to have been already known to the Receiving Party at the time of its disclosure to the Receiving Party and is not known by the Receiving Party to be the subject of an obligation of confidence of any kind;

(d)    independently developed by the Receiving Party without any use of or reference to the Confidential Information of the Disclosing Party as established by evidence that would be acceptable to a court of competent jurisdiction; or

(e)    is required to be disclosed pursuant to any statutory or regulatory authority, provided the Disclosing Party is given prompt notice of such requirement and the scope of such disclosure is limited to the extent possible, or is required to be disclosed by a court order, provided the Disclosing Party is given prompt notice of such order and provided the opportunity to contest it.

12.5    Equitable Relief. The Receiving Party acknowledges and agrees that due to the unique nature of the Disclosing Party's Confidential Information, there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach, inclusive of above, may allow the Receiving Party or Third Parties to unfairly compete with, or be advantaged over, the Disclosing Party resulting in irreparable harm to the Disclosing Party (to which money damages would not be a sufficient remedy therefore), and as such, that upon any such breach or any threat thereof, as a remedy for same, the Disclosing Party will be entitled to seek appropriate equitable relief in addition to whatever remedies it might have at law, including without limitation injunction and specific performance.

12.6    Remedies. Such remedies will not be deemed to be the exclusive remedies for a breach of this Agreement, but will be in addition to all other remedies available in equity or at law. The Receiving Party further agrees not to raise as a defense or objection to the request or granting of such relief that any breach of this Agreement is or would be compensable by an award of money damages and to waive any requirements for the securing or posting of any bond in connection with such remedy.

12.7    Unauthorized Disclosure. The Receiving Party will notify the Disclosing Party in writing immediately upon the occurrence of any such unauthorized release of Confidential Information or other breach. In the event that any of the provisions of this Agreement will be held by a court or other tribunal of competent jurisdiction to be unenforceable, the remaining portions hereof will remain in full force and effect.

12.8    Non-Circumvention. Each Party will not, directly or indirectly, (a) interfere with, circumvent or attempt to circumvent, avoid, by-pass, or obviate the other Party's interests, or the interests of or relationship between the other Party and its Affiliates, producers, sellers, buyers, brokers, dealers, resellers, distributors, intermediaries, financial institutions, technology owners, developers and/or manufacturers, including

22

without limitation in relation to each Parties' interests in the Licensor Projects as set out under Section 9, or (b) initiate purchase or sale agreements or other transactional agreements with any Third Parties, in an attempt to change or avoid, directly or indirectly, an obligation to pay any License Fees, Royalties or make any other payments, or to perform any other obligations, under this Agreement. Each Party will where practicable identify such Third Parties to the other Party.

12.9 **End-Users.** The Parties acknowledge that it will be necessary for the Licensee to make available the whole of or part of this Agreement and related agreements to End Users for the purpose of entering into Projects. The Licensee will require that the End Users enter into a confidentiality agreement and seek the prior consent of the Licensor in advance of such disclosure and Licensee shall ensure that all payment and other economic terms of this Agreement are not provided to any End Users (e.g. Licensee shall redact such portions of this Agreement).

## Section 13: REPRESENTATIONS AND WARRANTIES.

13.1 Each Party represents and warrants to the other Party as follows:

(a) <u>Organization</u>. Such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized.

(b) <u>Authorization and Enforcement of Obligations</u>. Such Party (i) has the requisite power and authority and the legal right to enter into this Agreement and to perform its obligations hereunder and (ii) has taken all requisite action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder. This Agreement has been duly executed and delivered on behalf of such Party, and constitutes a legal, valid, binding obligation, enforceable against such Party in accordance with its terms.

(c) <u>Consents</u>. All necessary consents, approvals and authorizations of all governmental authorities and other persons or entities required to be obtained by such Party in connection with this Agreement have been obtained.

(d) <u>No Conflict</u>. The execution and delivery of this Agreement and the performance of such Party's obligations hereunder (i) do not conflict with or violate any requirement of applicable laws, regulations or orders of governmental bodies and (ii) do not conflict with, or constitute a default under, any contractual obligation of such Party.

13.2 Licensor represents and warrants that as of the date of this Agreement:

(a) <u>Ownership</u>. The Licensor owns the Licensed IP and Trade Marks for the Licensed Products (including all rights necessary to grant the licenses granted hereunder to the Licensee).

(b) <u>Design Specifications</u>. The Design Specifications are sufficiently detailed to enable a person skilled in the art, to build, operate and run the Licensed Products.

(c) <u>Conflicting Rights</u>. It has not granted or agreed to grant to any person prior to entering into this Agreement any rights which conflict with, diminish or restrict

23

the rights granted to Licensee pursuant to this Agreement, and that no such rights will be granted to any person during the Term.

(d) Use. It has used the Licensed IP to produce/use/sell the Licensed Products prior to the Effective Date, but has not produced/used/disclosed/sold any Licensed Products in any manner which would prevent Licensor from obtaining patent protection under the PCT Application.

(e) Licenses. The Licensed IP is equivalent to the intellectual property currently used by Licensor and its Affiliates for the production/use/sale of the Licensed Products in the Exclusive Territory.

(f) Sufficiency of Licenses. To the actual knowledge of Licensor, the licenses granted by the Licensor to the Licensee under this Agreement will be sufficient and complete (subject to Section 13.2(g)) to enable the Licensee to produce, use, sell and exploit the Licensed Products as envisaged by this Agreement in the Exclusive Territory in the manner and to the same specifications and standards of quality as are used by Licensor and its Affiliates, provided that:

    (i) the Licensee complies with all reasonable standards, instructions and recommendations received from the Licensor;

    (ii) the equipment and tooling used by the Licensee to produce/use/sell the Product are comparable to those used by competent manufacturers experienced in the production of goods of similar complexity to the Licensed Products;

    (iii) the materials used by the Licensee for the production/use/sale of the Licensed Products either meet all requirements specified by the Licensor or are comparable to those used by competent manufacturers experienced in the production of goods of similar complexity to the Licensed Products; and

    (iv) the human resources, skills and techniques applied by the Licensee to the production/use/sale of the Licensed Products are similar to those used by the Licensor at their own facilities or are comparable to those of a competent manufacturer experienced in the production of goods of similar complexity to the Licensed Products.

(g) Canadian Patents and Trade Marks. To the best of Licensor's actual knowledge, the Licensed IP and Trade Marks to be applied for, issued or registered in Canada, and the Licensed Products, do not infringe any Canadian patent or trademark rights of any person.

(h) Validity. Licensor or its agent or authorized representative has not, nor to the best of its actual knowledge, has any person other than the Licensor or the Licensor's agent or authorized representative, done or omitted any act whereby the right to (a) obtain or enforce any Licensed IP; or (b) the validity of the Know-How or the registration of any Trade Mark is or will be impaired or prejudiced.

24

(i)     Proceedings. None of the Patent Rights relating to the Licensed IP is the subject of any pending interference, opposition, cancellation, impeachment, reissue, re-examination, conflict, protest, or other similar administrative proceedings, or judicial proceedings.

(j)     Notices. The Licensor has not received any: (i) notices or communications that the subject matter covered by the Design Specifications would infringe or misappropriate any Intellectual Property Rights of any Third Party; or (ii) allegation regarding legality, enforceability, or validity of the Licensed IP, other than those made by the government authorities examining the Licensed IP.

(k)     Encumbrances. There are no liens, charges, judgments, injunctions, decrees, rulings, security interests, or any other encumbrances, including, without limitation, pledges, assignment, shop rights, and covenants by the Licensor not to sue a Third Party on the Licensed IP.

(l)     Validity. None of the Licensed IP is lapsed, abandoned, deemed abandoned, forfeited, dedicated to the public, void, or otherwise invalid.

(m)     Licensed Software. Solely in relation to the Licensed Software:

     (i)     the authors of the Licensed Software and Source Code Documentation have waived or will waive all moral rights which they may have therein;

     (ii)     the Licensed Software will not include Third Party or Open Source Material, unless notified to Licensee in advance;

     (iii)     Licensor has not and will not grant any rights or licenses to the whole or any part of the Licensed Software or the Documentation or any other intellectual property or technology or entered into or enter into any agreement or understanding that would conflict with Licensor's obligations or Licensee's or its Affiliates' rights under this Agreement; and

     (iv)     the Licensed Software will perform those general operations and have those general characteristics as are represented in any of Licensor's published literature, descriptions and specifications, whether or not the literature, descriptions and specifications are included in or referenced in this Agreement; provided, such literature, descriptions and presentations refer to then-current, released, versions of the Licensed Software.

13.3     Manufacturing. Licensee warrants and agrees that it will only manufacture or have manufactured Licensed Products solely in strict compliance with the Design Specifications provided by Licensor to Licensee, including without limitation any modifications thereto as may be approved by Licensor in writing from time to time during the Term.

13.4     Disclaimer of Warranties. Except as expressly set forth in this Agreement or subsequently agreed pursuant to a Statement of Work, Licensor makes no representations or warranties, express or implied, regarding the Licensed IP, Trade Marks, Know-How, Improvements or any Deliverables, including without limitation, any representation or

25

warranty regarding validity, enforceability, merchantability, fitness for a particular purpose or non-infringement.

## Section 14: INDEMNIFICATION.

14.1 <u>Indemnification by Licensor</u>: Except for Excluded Claims (as defined in Section 14.2), Licensor agrees to indemnify, defend and hold harmless Licensee and any permitted sub-licensees and Affiliates of the Licensee, and their employees and agents ("**Licensed Users**" and each a "**Licensed User**"), from and against any and all Third Party Claims, demands, costs, damages, settlements and liabilities of any kind, and any action (including reasonable legal fees and expenses in connection therewith) in respect thereof to which a Licensed User or any of Licensee's resellers, agents, distributors and End Users may become subject insofar as such loss, claim, damage, liability or action arises out of, or is based upon: (a) infringement of any Third Party Intellectual Property Rights arising out of use of the Licensed IP or any part thereof or the Trade Marks; (b) a claim arising out of any breach of any representation or warranty of the Licensor under this Agreement; (c) a product liability claim with respect to Licensed Products manufactured by or for the Licensors, their Affiliates or their sub-licensees; and (d) a product liability claim with respect to Licensed Products manufactured by the Licensee or its sub-licensees under the licenses granted hereunder

14.2 <u>Excluded Claims</u>. Licensor will have no obligation for any Claim (an "**Excluded Claim**") under Section 14.1, arising from: (a) a combination by Licensee, its Affiliates or sub-contractors or any Third Parties of the Licensed Products with items not (i) specified in the Design Specification for such Licensed Product, (ii) supplied by Licensor for use with the Licensed Product, (iii) approved in writing for use with such Licensed Product by Licensor or (iv) constituting a normal or anticipated use of such Licensed Product, as determined by a reasonable person skilled in the use of the particular items and Licensed Products, if such claim arises solely out of such combination; (b) any product or device which has not been manufactured in strict compliance with the applicable Design Specification (unless such product or device was supplied by Licensor for use with the Licensed Product), if the non-compliance is a proximate cause of the event giving rise to such claim; (c) the adaptation or modification without Licensor's prior written approval of a Licensed Product in a way that is not intended as part of normal or anticipated use of such Licensed Product, as determined by a reasonable person skilled in the use of the particular Licensed Products, whether or not the literature, descriptions and specifications are included in or referenced in this Agreement; (d) a claim based on Intellectual Property Rights owned by Licensee or any of its Affiliates; (e) misuse of a Licensed Product outside of the normal or anticipated use of such Licensed Product, as determined by a reasonable person skilled in the use of the particular Licensed Products; and (f) use of a Licensed Product in violation of any applicable license granted in writing to Licensee for such Licensed Product; (g) a failure of Licensee or the applicable End User to timely implement any upgrade or modification to a Licensed Product that (i) Licensor offers to install without charge, or (ii) Licensor provides to Licensee in a form which may be installed or implemented by Licensee or the applicable End User easily and without incurring a material cost, and provided in either case that such upgrade or modification does not substantially interfere with the normal use of such Licensed Product, if the infringement claim could have been avoided by the use of such upgrade; or (h) Licensor's compliance with any particular specification or design criteria imposed specifically by Licensee, outside of Licensor's normal, published or expected specifications or design

26

criteria for such Licensed Product, which results in the infringement of the Intellectual Property Rights of or personal or property damage to a Third Party.

14.3 Indemnification by Licensee: Licensee agrees to indemnify, defend and hold harmless Licensor, any permitted sub-licensees and Affiliates of the Licensor, and their employees and agents, from and against any and all Third Party Claims, demands, costs, damages, settlements and liabilities of any kind, and any action (including reasonable legal fees and expenses in connection therewith) in respect thereof to which the Licensor or its Affiliates or sub-licensees may become subject insofar as such loss, claim, damage, liability or action arises out of, or is based upon: (a) infringement of any Third Party Intellectual Property Rights arising out of use of any Licensee Improvements; (b) any Excluded Claim; (c) a claim arising out of any breach of any representation or warranty of WTE Canada, and (d) a product liability claim with respect to Licensed Products manufactured by Licensee, its Affiliates or their sub-licensees which is an Excluded Claim.

14.4 Remedies. Without prejudice to Section 14.1 and Licensees rights or remedies under this Agreement, should use of any Licensed Product be temporarily or permanently enjoined by a court or by an arbitrator, or where a Claim has been substantiated and determined by such court or arbitrator to constitute an actionable infringement, violation or misappropriation of any Third Party Intellectual Property Rights, Licensor will at its entire expense do one of the following, provided that Licensor will:

    (a)    procure for Licensee the right to use the Licensed Product, Licensed IP or Trade Mark free of any liability;

    (b)    replace all affected Licensed Products in the use, in the possession or under the control of the Licensee with other Licensed Products or services that will not be so enjoined or constitute an actionable infringement, violation or misappropriation, provided that the replacement Licensed Products are substantially of equivalent functionality and performance to those contracted for, that such replacement Licensed Products or services have been tested before replacement and accepted as satisfactory in accordance with any acceptance provisions contained in this Agreement; or

    (c)    modify all affected Licensed Products or to the extent applicable the Licensed IP or Trade Marks in the use, in the possession or under the control of the Licensed Users so that such modified Licensed Products, Licensed IP or Trade Marks will not be so enjoined or constitute an actionable infringement, violation or misappropriation, provided that the modified products are substantially of equivalent functionality and performance to those contracted for, that such modified products have been tested before replacement and accepted as satisfactory in accordance with any acceptance provisions contained in this Agreement.

14.5 Options. Without prejudice to Section 14.1 and Licensee's rights or remedies under this Agreement, in the event that Licensor has used all reasonable efforts to provide the remedies set forth in Section 14.4 (a), (b) or (c), and, despite such efforts, Licensor has been unable to obtain the necessary agreement of any applicable Third Party with respect to such remedies, taking into account both Licensor, Licensee and Licensed Users' considerations, then and only then, Licensor will, subject to the next sentence of this

27

Section 14.5, (a) request in writing that Licensee and each Licensed User cease using such Licensed Product within a period of time reasonably necessary for the Licensee and Licensed Users to acquire and implement replacement products or services that are substantially of equivalent functionality and performance for such Licensed Products, (b) accept the return of the Licensed Product, or part thereof, as applicable; (c) compensate each Licensed User for the reasonable and documented costs actually incurred by the Licensed User in connection with the removal of such Licensed Product or part thereof, as applicable, and (d) refund the fees paid for such Licensed Product or part thereof, and its installation as applicable. In determining the amounts to be paid pursuant to this Section 14.5, the Licensor shall only be required to pay a pro rata portion of such amounts based on the ratio of the remaining useful life of the Licensed Product to the expected useful life of the Licensed Product as determined in accordance with a twenty year useful life. To the extent that there is a dispute regarding the terms and interpretation of this Section 14.5 it will be dealt with in accordance with Section 18.3 of this Agreement.

14.6   Procedure. If a Party (the "**Indemnitee**") intends to claim indemnification under this Section 14, it will promptly notify the other Party (the "**Indemnitor**") in writing of any claim, demand, action or other proceeding for which the Indemnitee intends to claim such indemnification, and the Indemnitor will have the right to participate in, and, to the extent the Indemnitor so desires, to assume the defense thereof with counsel mutually satisfactory to the Parties; *provided, however,* that an Indemnitee will have the right to retain its own counsel, with the fees and expenses to be paid by the Indemnitor, if representation of such Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to actual or potential conflicting interests between the Indemnitee and any other Party represented by such counsel in such proceeding. The obligations of this Section 14 will not apply to amounts paid in settlement of any claim, demand, action or other proceeding if such settlement is effected without the consent of the Indemnitor, which consent will not be withheld or delayed unreasonably. The failure to deliver written notice to the Indemnitor within a reasonable time after the commencement of any such action, if prejudicial to its ability to defend such action, will relieve the Indemnitor of any obligation to the Indemnitee under this Section 14. The Indemnitee, its employees and agents, will reasonably cooperate with the Indemnitor and its legal representatives in the investigation of any claim, demand, action or other proceeding covered by this Section 14.

14.7   Trustee. The Licensor hereby consents to the appointment of Licensee as the trustee for the Licensed Users of the covenants of indemnification of the Licensor with respect to such Licensed Users specified in this Agreement and Licensee accepts such appointment.

## Section 15:   LIMITATIONS OF LIABILITY.

15.1   Except for the damages relating to infringement pursuant to Section 14 above:

(a)   The liability of: (i) the Licensee and any of its Affiliates or sub-licensees; and (ii) the Licensor and any of its Affiliates, under this Agreement, whether based on warranty, contract, tort or otherwise, and whether or not arising as a result of the negligence of the Licensee, its Affiliates or sub-licensees, or the applicable Licensor or its Affiliates, will not exceed five million dollars ($5,000,000).

28

(b)    The foregoing notwithstanding, in no event will a Party or its Affiliates or sub-licensees be liable (either jointly or severally) for any lost profits, special, exemplary, incidental, indirect or consequential damages or punitive damages arising out of or in connection with this Agreement, *provided, however*, no limitation will apply to either Party's liability, if any, for (i) a breach of its confidentiality obligations hereunder, (ii) any consequential damages that may be awarded against a Party by a court of competent jurisdiction in respect of a Third Party Claim pursuant to Section 14, (iii) either Party's liability, if any, arising out of the gross negligence or intentional misconduct of such Party or its Affiliates or their respective directors, officers, employees or agents and (iv) Licensee's obligation to make any undisputed payment to Licensor pursuant to this Agreement and (y) that the limitation on lost profits shall not apply to a Party's liability, if any, for exceeding the scope of any licenses granted to such Party by the other Party pursuant to this Agreement.

(c)    On a Project by Project basis the Supplier acknowledges that certain End Users of Licensee will require higher limitations of liability and levels of insurance to be taken on by both Parties. The Supplier will increase its limitation of liability levels and levels of insurance in a Statement of Work, as agreed with the Licensee and any End User, provided that it is able to factor in any increased insurance premiums in its fees for such Statement of Work.

## Section 16:    TERM; TERMINATION.

16.1    <u>Term</u>. Unless earlier terminated as provided herein, the term of this Agreement will commence on the Effective Date and will be perpetual (the "**Term**"). The Parties hereto expressly acknowledge and agree that Licensor will not have or exercise any right, express or implied, to terminate this Agreement, without cause.

16.2    <u>Breach of Agreement</u>. If either Party materially breaches any of its representations, warranties, covenants or obligations under the Agreement, and such breach results in a material adverse affect to the other Party (or repeated breaches which, in the aggregate, constitute a material breach), such other Party will have the right, at its sole election to terminate the Agreement, subject to Section 16.7, upon providing thirty (30) days written notice to the breaching Party, unless such breach will have been cured prior to the end of the notice period.

16.3    <u>Bankruptcy, Liquidation, Etc.</u>: A Party may terminate the Agreement or any Statement of Work upon giving written notice to the other Party, if the other Party (a) files in any court or agency pursuant to any statute or regulation of any state or country, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of the other Party or of its assets; (b) proposes a written agreement of composition or extension of its debts; (c) is served with an involuntary petition in bankruptcy or seeking reorganization, liquidation, dissolution, winding-up arrangement, composition or readjustment of its debts or any other relief under any bankruptcy, insolvency, reorganization or other similar act or law of any jurisdiction now or hereafter in effect, which petition is not dismissed within ninety (90) days after the filing thereof; (d) has any attachment, execution, or similar process issued against it which is not dismissed or stayed within ninety (90) days after the issuance thereof; (e) proposes to be a party to any dissolution or liquidation; or (f) makes an

29

assignment for the benefit of creditors or a trust mortgage (each event being an "**Act of Insolvency**").

16.4    Change of Control.  Either Party may terminate the Agreement and any or all outstanding Statements of Work upon giving written notice to the other Party,  if the other Party affects a Change of Control without such Party's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.   It will not be deemed to be unreasonable for a Party to withhold its consent for any Change of Control which such Party has a clear and reasonable belief would result in an adverse effect upon such Party's business, prospects or reputation, including without limitation, any clear and reasonable belief that the acquiring party (a) is in competition with the terminating Party's business, (b) has inadequate capitalization or financial strength to perform its obligations under this Agreement, or (c) will not adequately protect or respect the terminating Party's rights in or to its Intellectual Property. The Party requesting a written consent pursuant to this Section 16.4 will provide such information about the acquiring party as the other Party may reasonably request in connection with its review of the acquiring party.

16.5    Mutual Agreement.  The Parties may terminate the Agreement at any time upon their mutual written agreement.

16.6    Termination without Cause.  The Licensee may terminate this Agreement for any reason or without reason upon thirty (30) days written notice to the Licensor without penalty.

16.7    Effect of Expiration or Termination.  Anything to the contrary notwithstanding, in the event that the Agreement is terminated or expires for any reason whatsoever, subject to Section 11 of the Development and Support Agreement which provides for the completion of any ongoing Projects:

(a)    all licenses granted by Licensor to Licensee will immediately terminate except that the licenses granted to End Users relating to completed Projects will remain in place solely to allow the End Users to continue to enjoy the Licensed Products in accordance with Licensor's agreements with End Users, but only (i) to the extent that such licenses were granted to such End Users in compliance with the terms of this Agreement and (ii) to the extent, with respect to any Licensed Software, the End User is in compliance with the EULA;

(b)    each Party will return to the other Party or destroy (in the other Party's reasonable discretion) any and all of such other Party's Confidential Information except in relation to each continuing Statement of Work;

(c)    Licensor will promptly invoice Licensee for any previously unbilled amounts owed to Licensor pursuant to the Agreement, except for (i) continuing Statements of Work that will continue to be billed and paid in accordance with their terms and (ii) any Royalties relating thereto which would have accrued had such termination not occurred that will continue to be invoiced and paid as if this Agreement had not been terminated;

(d)    Licensee will pay all outstanding undisputed amounts due under this Agreement and any related invoices;

30

(e)    the balance of any outstanding Minimum Royalties for any partial year will be prorated based upon the portion of the year then-elapsed up to the date of termination and such Minimum Royalties will be paid within 45 (forty five) days of the date of termination; and

(f)    the Development and Support Agreement will automatically terminate in accordance with its terms.

16.8    <u>Preservation of Accrued Rights</u>. Expiration of the Term or termination of this Agreement will be without prejudice to any rights or remedies which will have accrued to the benefit of a Party prior to such expiration or termination. Without limiting the foregoing and except as otherwise specifically provided herein, Section 7 (Escrow), Section 11 (Payments), Section 12 (Confidentiality), Section 13 (Representation and Warranties), Section 14 (Indemnification), Section 15 (Limitation of Liability), Section 17 (Insurance), for such period as may additionally be required under a Statement of Work, Section 18 (Miscellaneous), Section 16.7 (Effect of Expiration and Termination), Exhibit C (Warranty), but only for the stated term of such warranty, this Section 16.8 and such other terms as may expressly or impliedly be intended to survive, will survive any expiration or termination of this Agreement.

**Section 17:    INSURANCE.**

17.1    <u>Insurance Levels</u>. Each Party will procure and maintain in force throughout the Term and for the duration of the Development and Support Agreement, and for a period of one year after the expiration or termination of this Agreement:

(a)    Comprehensive commercial general liability insurance with a combined single limit of not less than five million dollars ($5,000,000) per occurrence for bodily injury, including death, property damage liability, personal injury (including invasion of privacy, libel, slander or discrimination) contractual liability and products and completed operations liability.

(b)    Workers compensation insurance or any alternative plan or coverage permitted or required under applicable law and employer's liability insurance with a minimum limit of not less than five million dollars ($5,000,000) per occurrence.

(c)    Comprehensive professional liability insurance covering liability for financial loss suffered by Licensee due to any error, omission or negligence of such Party, its employees, directors, officers, agents or subcontractors in the performance of the Services with a minimum limit of not less than five million dollars ($5,000,000) per claim.

(d)    All risks property insurance for the full replacement cost of premises, machinery and equipment used in connection with the performance of the Development Services.

17.2    <u>Insurance Standards</u>. All insurance policies will be with insurers rated a minimum of "A minus" by A.M. Best, and the other Party will be named an additional insured with respect to such Party's comprehensive commercial general liability insurance. Compliance with this Section 17 will not relieve either Party from compliance with any other obligations set out in this Agreement.

31

## Section 18: MISCELLANEOUS.

18.1  <u>Governing Law</u>. This Agreement will be governed by, interpreted and construed in accordance with the laws of The Isle of Man, without regard to the conflicts of law principles thereof or of any other jurisdiction; *provided, however,* regardless of where an invention is discovered, developed or otherwise generated and regardless of the laws of the country in which any corresponding patent application is filed, questions of inventorship will be resolved in accordance with the patent laws of the jurisdiction in which such the applicable patent application was filed or the applicable patent was issued.

18.2  <u>Waiver</u>. No waiver by a Party hereto of any breach or default of any of the covenants or agreements herein set forth will be effective unless set forth in writing signed by the waiving Party or will be deemed a waiver as to any subsequent and/or similar breach or default.

18.3  <u>Dispute Resolution Procedures</u>.

   (a)  <u>Mediation</u>. Except as set forth in Section 18.3(d), the Parties will attempt in good faith to resolve any and all disputes that arise between them promptly, voluntarily and amicably. Any dispute arising between the Parties relating to, arising out of, or in any way connected with the Agreement (a **"Dispute"**), whether before or after expiration or termination of the Agreement, which is not settled by the Parties within thirty (30) days after written notice of such Dispute is first given by one Party to the other Party in writing, will be settled by arbitration in Boston, Massachusetts, pursuant to the rules then obtaining of the International Centre for Dispute Resolution of the American Arbitration Association and its International Dispute Resolution Rules, procedures and guidelines, provided the Parties will be entitled to perform appropriate discovery. Any award in any such arbitration will be final, binding and conclusive upon the Parties, absent manifest error, and a judgment rendered thereon may be entered in any court having jurisdiction thereof. The Parties specifically authorize and empower the arbitrator to issue injunctive or other equitable relief, where appropriate.

   (b)  <u>Confidential Information</u>. At the request of either Party, the arbitrator(s) will enter a protective order in such form as the Parties will stipulate or as the arbitrator(s) will determine is suitable in order to protect Confidential Information and any other matter that either Party would normally not reveal to Third Parties. Among other things, the protective order will stipulate that the arbitrator(s) themselves will receive any information designated as "confidential" solely for purposes of assessing the facts and law in order to issue a ruling or an award and will not otherwise use or disclose such matter. The protective order will be entered as an award of the arbitrators.

   (c)  <u>Rulings and Awards</u>. All arbitral rulings and awards will be final, binding and non-appealable by the Parties.

   (d)  <u>Intellectual Property Rights</u>. Anything to the contrary notwithstanding, as between the Parties, any dispute, controversy or claim relating to the scope, validity, enforceability, inventorship or ownership of Intellectual Property Rights

32

will be submitted by either Party to a court of competent jurisdiction in the country in which such rights apply, and to the full extent allowed by law, either Party may bring an action in any court of competent jurisdiction for specific performance or injunctive relief (or any other provisional remedy) to protect the Parties' rights or enforce the Parties' obligations under the Agreement.

18.4    Continued Performance. Each Party agrees to continue performing its obligations under this Agreement while any dispute is being resolved, except to the extent the issue in dispute precludes or substantially impairs performance or continued performance and without limiting either Party's rights set forth in this Agreement to terminate this Agreement or any Statement of Work. A dispute solely over payment will not be deemed to substantially impair a Party's performance provided such dispute is limited to the payment for specific milestone or task to be performed and the disputing party continues to make payments when due with respect to non-disputed amounts and to perform its other obligations under this Agreement.

18.5    Assignment.  Licensee may not assign or delegate this Agreement or any right or obligation hereunder, in whole or part, without the prior express written consent of Licensor, except as part of an internal reorganization of the Licensee and its Affiliates. Any permitted assignee will assume all obligations of its assignor under this Agreement. Any purported assignment in violation of this Section 18.5 will be void.

18.6    Independent Contractors.  The relationship of the Parties hereto is that of independent contractors. Neither Party hereto will be deemed to be the agent, partner or joint venturer of the other for any purpose as a result of this Agreement or the transactions contemplated hereby.

18.7    Non-Solicitation. No Party to this Agreement or their respective Affiliates will solicit the employment of any employee of the other Party, or the services or assistance of any employee of the other Party other than as part of that employee's duties to its own employer, at any time during the Term or for a period of six (6) months after the termination of this Agreement, unless both Parties have agreed otherwise in writing. The Parties agree that this section of the Agreement will be of no further force or effect with respect to a Party in the event that the Party who was the employer of a solicited employee has ceased to operate a business engaged in the development, manufacture or sale of Licensed Products.

18.8    Further Actions.  Each Party agrees to execute, acknowledge and deliver such further documents and instruments and to perform all such other acts as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement.

18.9    Notices.  All requests and notices required or permitted to be given to the Parties hereto will be given in writing, will expressly reference the section(s) of this Agreement to which they pertain, and will be delivered to the other Party by mail or any commercial delivery service (in each case, with appropriate confirmation of delivery) or electronically (provided notice is actually received by the recipient), in all cases delivery to be effective on receipt, at the appropriate address as set forth below or to such other addresses as may be designated in writing by the Parties from time-to-time during the Term.

33

If to Licensee:           WTE Waste To Energy Canada, Inc.
                            2267 West 10th Avenue
                            Vancouver, British Columbia, Canada
                            Attn: Alistair Haughton

If to Licensor:           Waste2Energy Technology International Limited
                            c/o Waste2Energy Holdings, Inc.
                            1 Chick Springs Road
                            Greenville, SC, 29609
                            Attn: Peter Bohan

18.10    No Implied Licenses. Only licenses and rights granted expressly herein will be of legal force and effect. No license or other right will be created hereunder by implication, estoppel or otherwise.

18.11    Force Majeure. Nonperformance of a Party (other than for the payment of money) will be excused to the extent that performance is rendered impossible by strike, fire, earthquake, flood, governmental acts or orders or restrictions, terrorist acts, failure of suppliers, or any other reason where failure to perform is beyond the reasonable control and not caused by the negligence, intentional conduct or misconduct of the nonperforming Party; *provided, however*, that the nonperforming Party will use commercially reasonable efforts to resume performance as soon as reasonably practicable.

18.12    Order of Priority. In the event of any inconsistency between any of the provisions of the main terms and conditions of this Agreement and/or any schedules or exhibits hereto, the provisions of the main terms and conditions of this Agreement will govern. Any document executed subsequently to any other document will override a prior document to the extent of any inconsistency, but only for the purposes of such subsequently executed document and only if such document expressly states that it is intended to override the previous document.

18.13    Cumulative Remedies. The rights and remedies set forth in this Agreement in the event of a breach by either Party of this Agreement are cumulative with any other rights and remedies, however arising, which may be available to the Parties under the circumstances.

18.14    Complete Agreement. This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof, and all prior representations, understandings and agreements regarding the subject matter hereof, either written or oral, expressed or implied, are superseded and will be of no effect.

18.15    Further Assurance. The Parties will from time to time execute and deliver all such further documents and instruments and do all acts and things as the other Party may reasonably require to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement.

18.16    Severability. Should any provision of this Agreement be held to be void, invalid or inoperative, the remaining provisions of this Agreement will not be affected and will continue to be effective and the invalid provision will be modified to the least degree necessary to remedy such invalidity.

34

18.17   Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed to be an original and together will be deemed to be one and the same agreement.

18.18   Headings.  The captions to the several sections hereof are not a part of this Agreement, but are included merely for convenience of reference only and will not affect its meaning or interpretation.

18.19   Extended Meanings.  In this Agreement words importing the singular number only include the plural and vice versa, words importing any gender include all genders and words importing persons include individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures and governmental authorities. The term "including" means "including without limiting the generality of the foregoing".

18.20   Exhibits.  The Exhibits form a part of this Agreement.


**[Remainder of Page Intentionally Left Blank]**

*DOCS #1293613 v. 3*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered as of the date first above written.

LICENSOR

**Waste2Energy Technology International Limited**

By: _____

Name: _____

Title: _____

LICENSEE

**WTE Waste To Energy Canada, Inc.**

By: _____

Name: _____

Title: _____

36

## Exhibit A

### Royalty Provisions

During the Term, Licensee will pay to Licensor the following royalties:

1. With respect to Licensor's cBOS™ Licensed Product, $250,000.00 for each train (consisting of four primary units, a secondary unit and appurtenant hardware) sold, leased or otherwise transferred within the Exclusive Territory by Licensee to a Third Party during the Term, for such Licensed Product.

2. With respect to Licensor's sBOS™ Licensed Product, a one off charge of: (a) $15,000.00 for the first metric tonne per day of capacity; and (b) $2,500.00 per additional metric tonne or fraction thereof of additional per day capacity; in each case sold, leased or otherwise transferred within the Exclusive Territory by Licensee to a Third Party during the Term, for such Licensed Product.

3. With respect to Licensor's COR™ Licensed Product, a one off charge of $50,000.00 for each 100 metric tonnes per day of capacity sold, leased or otherwise transferred within the Exclusive Territory by Licensee to a Third Party during the Term for such Licensed Product. If capacity is sold in fractions of 100 metric tonnes, the Licensee will pay $500.00 per metric ton of capacity sold.

4. In the event that Licensee sells, leases or otherwise transfers and Licensed Product outside of the Exclusive Territory, Licensee will pay to Licensor the Royalty rates defined in 1 – 3 above plus an additional 15%.

37

**Exhibit B**

**Minimum Royalties**

The minimum Royalties that will be due and payable by Licensee during the Term of this Agreement are as set forth below:

| Period | Annual Minimum Royalties |
|---|---|
| During the twenty four month period commencing with the Effective Date: | Zero |
| During the twelve month period commencing on the second anniversary of the Effective Date: | $500,000.00 |
| During the twelve month period commencing on the third anniversary of the Effective Date: | $750,000.00 |
| During the twelve month period commencing on the fourth anniversary of the Effective Date: | $1,000,000.00 |
| During each twelve month period commencing on the fifth anniversary of the Effective Date and ending on the date of termination or expiration of the Agreement: | $1,250,000.00 |

*DOCS #1293613 v. 3*

**Exhibit C**

**Warranty**

1. <u>Warranty.</u> Licensor warrants that the Licensed Software and Source Code Documentation for the Licensed Software will, subject to Section 3 of this Exhibit, until the earliest to occur of : (a) 18 months from the completion of Hot Commissioning; or (b) 12 months from Completion ("**Warranty Period**"): (A) be in complete conformity with the applicable Software Specifications; (B) function and perform in accordance with applicable Software Specifications, including all load and volume benchmarks and functional performance criteria identified therein; and (C) function so as to enable each of the Licensed Products to operate in accordance with the applicable Design Specifications in a commercial environment.

2. <u>Licensor support during Warranty Period.</u> Licensor will at its sole cost and expense make all necessary Enhancements to the Licensed Software to maintain it in the condition set out in Section 1 of this Exhibit during the Warranty Period. In the event that Licensor becomes aware of an Enhancement that is required to the Licensed Software to ensure its conformity with the requirements in Section 1 of this Exhibit or if Licensor generally releases an Enhancement to its End Users, Affiliates or other licensees, Licensor will notify the Licensee.

3. <u>Extension of Warranty Period.</u> If during the testing or Hot Commissioning of a Licensed Product the Licensed Software fails to perform in accordance with the Software Specifications, the Warranty Periods under Section 1 above and any extended Warranty Period referred to under Section 5 below, will be extended by a period of time equal to the delay from the date that Licensee notifies Licensor of the fault until the date that the Licensee confirms that the Licensed Software operates in accordance with the Software Specifications. In the event that the Warranty Period has commenced pursuant to Section 1 above, but the Licensed Product is inoperative during such period, due to a reason caused by the End User or a Third Party, or if the End User decides to delay the operation of the Licensed Product, the Warranty Period will continue to run. If the cause of the delay is outside of the reasonable control of the End User the Parties may agree to postpone the Warranty Period to enhance the goodwill with such End User.

4. <u>Installation of Enhancement.</u> Licensor will install Enhancements at End User and Licensee sites as soon as possible in accordance with its support obligations under the Development and Support Agreement. If the Enhancement can be installed by the Licensee, and Licensee in its sole discretion opts to install the Enhancement at its own sites or End User sites, it will be delivered to Licensee as soon as possible and by the latest when such Enhancement is made generally available to any Affiliate, licensee or End User of the Licensor. At the same time Licensor will deliver to Licensee a written notification which will include: (a) a description of the impact of the Enhancement on the Licensed Software; (b) additional equipment or versions of the Licensed Software or Third Party Software, if any, which Licensee will be provided with to use such Enhancement; (c) the purpose for the development of such Enhancement; (d) the results to be achieved by installing the Enhancement; and (e) if the Enhancement can be implemented by Licensee the schedule of activities required by Licensee to implement the Enhancement. If the Enhancement can only be installed by the Licensor, Licensor will install the Enhancement as soon as possible. There will be no charge to Licensor for the implementation of an Enhancement by the Licensor.

5. <u>Extended Warranties.</u> During or shortly after the completion of the preliminary engineering design study for each Project the Licensee will provide sufficient information to the Licensor to

39

enable the Parties to come to a decision as to the terms of an extended warranty to be offered by the Licensee or Licensor or both, to the End User. Following receipt of the information from the Licensee the Licensor will respond with its proposal as soon as possible and in any event within five Business Days of notification. The Parties will negotiate in good faith the terms of the extended warranty. The failure of the Parties to agree to the terms of an extended warranty will not, subject to the limitations set by the terms of this Agreement, prevent the Licensee from offering extended warranty terms to an End User on its own.

6.   <u>Availability of Support Technician</u>.  Licensor will maintain or cause to be maintained suitably qualified support technicians available to fulfill the Licensor's obligations under this Agreement, including without limitation the warranty in this Exhibit C pursuant to Section 2.3 of the Development and Support Agreement.

*DOCS #1293613 v. 3*

**Exhibit D**

**Trade Marks**

1. W2e
2. Waste2Energy
3. BOS
4. cBOS
5. sBOS
6. COR

41

**Exhibit E**

**Licensor Projects and Contingent Projects**

**Licensor Projects**

The first project initiated by Albert Pope via XTn Group LLC or an affiliated group.

The first project sold by EMISPEC, unless WTEC has sold an identical unit prior to the sale by EMISPEC.

**Contingent Projects**

Other than the first COR project, all other projects sold by EMISPEC.

*DOCS #1293613 v. 3*

**Exhibit F**

**EULA**

43