# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WASTE2ENERGY HOLDINGS, INC.<br><br>Debtor. | Case No. 11-12504 (KJC)<br>Chapter 11 |

## DECLARATION OF JARED GURFEIN IN SUPPORT OF MOTION TO APPOINT A TRUSTEE FOR THE DEBTOR

I, Jared Gurfein, hereby declare pursuant to 28 USC § 1746:

1. My name is Jared Gurfein and I reside at 515 E. 87th Street, Apt. 3W, New York, New York. I am an attorney in good standing, licensed to practice law in the State of New York since 1995, and in the U.S. District Courts for the Southern and Eastern Districts of New York since the same date. I have personal knowledge of the matters and facts herein deposed to except where they are stated to be based on information and belief, in which case I believe them to be true.

2. I was retained on June 8, 2011 by Luppino Landscaping & Masonry, LLC and Andrew Savage, both of whom are creditors of Waste2Energy Holdings, Inc. ("W2E") and are petitioning creditors in the above-captioned involuntary bankruptcy. Initially I was retained to advise my clients in connection with a possible restructuring of W2E in which there was a possibility that they would become members of the board of a subsidiary of W2E.

3. After attending an initial meeting on June 8, 2011 with the CEO of W2E, John Murphy, my clients asked me to attend a scheduled meeting on their behalf on June 9, in which Mr. Murphy, and W2E's chairman and sole director would be meeting with a large commercial partner of the Company known as Waste To Energy Canada ("WTEC") that I was told held a license to exploit W2E's proprietary technology in Canada as well as other approved locations.

{00119121.DOC; 1}

4. On June 9, I did in fact attend the meeting between Messrs. Murphy and Taylor on the one hand, and several members of WTEC on the other, including Alistair Haughton and Rod Taylor, as well as another member of their team. The meeting took place in midtown Manhattan at an upscale restaurant.

5. At the outset of the meeting, I identified myself to everybody as an attorney, working on behalf of two creditors of the Company, and offered to leave if anybody was not comfortable with my presence because they did not have counsel present. Nobody objected, and I did not substantively participate in the discussions other than to take notes to report back to my clients.

6. During the meeting, Mr. Murphy and Mr. Taylor told Mr. Haughton's team that their license agreement was not valid, despite that it had been signed by Mr. Taylor himself over a year prior, proclaiming "the license agreement is not valid and we've known that for over a year", claiming that counsel had advised them as much. Murphy and Taylor each stated this several times. Their basis for this claim was that no proper corporate resolution had been adopted by the subsidiary in the Isle of Man that holds the intellectual property rights to the technology. Mr. Taylor acknowledged he is a director both of W2E and the Isle of Man subsidiary, despite making this bizarre claim that the agreement was somehow not authorized by the subsidiary, and despite his acknowledgment that W2E was the sole, indirect owner of the Isle of Man Company and controlled it completely. Mr. Taylor also stated he is the only director of W2E.

7. I have since learned, from discussions with the former CEO of W2E, Peter Bohan, as well as from discussions with WTEC, that standing in stark contrast to the assertions of Mr. Murphy that W2E knew a year earlier that the license was invalid, that three separate

amendments to the allegedly invalid license agreement were entered into within the past year expanding WTEC's rights as WTEC provided additional capital to W2E.

8. Mr. Haughton of WTEC explained to Murphy and Taylor that they had relied on the license agreement in entering into a raft of contracts with various municipal and national governments, all with the knowledge of W2E, and that it was essential that the technology in the license agreement be delivered to WTEC to forestall WTEC defaulting on its commitments to clients.

9. In response to Mr. Haughton's plea for fulfillment of the delivery of the IP, which at this point was long overdue, Mr. Murphy stated "I could deliver the IP in a week if I wanted to." Mr. Murphy continued that he refused to deliver the IP, or "validate" the WTEC license, unless WTEC was prepared to pay $2 million in cash to W2E immediately, and to outsource all construction to an unnamed Chinese company with which Mr. Murphy and Mr. Taylor had begun a relationship, at an undefined cost and with a premium attached to the construction, plus a royalty payment of several hundred thousand dollars per unit to W2E.

10. WTEC countered Mr. Murphy's 'proposal' by offering to buy the assets out from W2E entirely, and offered to provide a term sheet with the framework of a transaction. Both parties had mentioned the existence of a prior asset purchase agreement between them that had expired, and this appeared an attempt to resurrect that transaction. Mr. Murphy rejected the notion out of hand and refused to look at any proposals.

11. At the conclusion of the meeting, Mr. Haughton and the WTEC team left without commenting on the "proposal" made by Mr. Murphy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2011.

                                                          _____
                                                                      JARED GURFEIN