# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WASTE2ENERGY HOLDINGS, INC.,<br><br>Alleged Debtor. | Chapter 11<br><br>Case No. 11-12504 (KJC) |

## DECLARATION OF JOHN JOSEPH MURPHY II
## IN SUPPORT OF DEBTOR'S OPPOSITION TO TRUSTEE MOTION

I, JOHN JOSEPH MURPHY II ("Declarant") hereby declare as follows:

1. Declarant is Chief Executive Officer of Waste2Energy Holdings, Inc., a Delaware corporation ("W2E") and the alleged debtor herein and is legally authorized and competent to make this declaration. I have personal knowledge of the matters stated herein unless otherwise noted.

2. Declarant has been accused of incompetence, avarice and betrayal of W2E, its creditors and its investors by the Petitioning Creditors ("PC") and others, in support of those creditors, who have petitioned the Court for the emergency appointment of a trustee and the dismissal of Declarant.

3. The accusations of the PC are utterly false and call for drastic action that would completely destroy any potential value of W2E and eliminate the possibility of a successful reorganization and continuation of the business of W2E and its subsidiaries.

1

4. Declarant, working with the Chairman of the Board of W2E, Christopher Taylor ("Taylor"), has been engaged for several months in intensive negotiations that have a strong probability of success that will (i) obtain substantial and on-going financing from a major customer; and (ii) provide for the completion of W2E's major project in Dargavel, Scotland and the continuation of a new project recently ordered and underway in Baoshan, China. The personal relationships of Declarant and Taylor with the prospective financier and with the owner of the Dargavel facility in Scotland are absolutely necessary to the successful completion of these negotiations.

5. Declarant served as a consultant to W2E during 2009 primarily located in Dargavel, Scotland to and through August 2010. While Declarant was still contracted as a consultant the former CEO, Peter Bohan ("Bohan"), took all of the daily tasks of completing the plant away from Declarant. Declarant was later appointed Chief Executive Officer of W2E in May 2011 to replace Bohan who was terminated for cause on May 11, 2011. Bohan served as CEO from September 2009 until his termination.

6. Declarant has a strong resume as a turnaround expert and as a business owner and operator. In the past, Declarant served as a receiver in certain significant matters and Declarant is well-acquainted with maximizing the value of assets and dealing fairly with creditors. Declarant also has taken his responsibilities as a consultant and now as Chief Executive Officer extremely seriously and without

regard to an extremely heavy workload, including substantial traveling, and has made many personal sacrifices in performance of his duties.

7. As a previous consultant to W2E, Declarant was also intimately involved in the day to day operating problems that W2E was faced with and caused by the former CEO. Declarant believes that, because of his on-the-ground experience in Dargavel, (the only near-operational plant using W2E technology), he is the most knowledgeable person in the employ of W2E concerning the construction and operation of a plant using W2E technology. Declarant believes that his knowledge and practical experience far exceed that of the previous CEO, Bohan.

8. Declarant has been accused of certain excessive expenditures while serving as a consultant for W2E Engineering ("WTEE"), a Scottish company in liquidation in Dargavel, Scotland during 2009 through August 2010. Specifically, the Emergency Motion at Item 35 refers to the usage of WTEE funds for extensive redecorating and the construction of a putting green at a rented property in Scotland and the purchases of two Mercedes Benz and one Jaguar automobile. This completely mischaracterizes the careful, authorized and responsible conduct of Declarant in arranging for accommodations for himself and his team. He was able to lease a four bedroom house in unkempt condition for £800/month. Declarant authorized interior painting and some exterior landscaping (which, because it was mowed in a crisscross pattern, vaguely resembled a putting green) to provide acceptable housing. The total cost beyond base rental of approximately $11,000 made the previously unkempt property minimally appropriate for an executive

3

expatriate of Declarant's experience and level of seniority. Further, at all times the Company could have inquired and discussed these matters with Declarant. Company management never discussed any of these matters with Declarant and made no claims against him. His first knowledge that any issues existed were in the Chapter 11 documentation.

9. Declarant then arranged to share the house with two other members of his team. WTEE was thus able to save significantly from the usual expatriate practice of individual accommodations for each employee or consultant. During much of this period the three executives worked more than 60 hours per week.

10. Declarant also saved on transportation costs by buying three old used cars instead of leasing cars from Enterprise. They were in fact two Mercedes Benz and one Jaguar and their average age was eight years old. The cars were purchased for an average of $10,000 each and were used for the eight-month stay of Declarant and his team. The cost of the cars (which were then retained as property of WTEE and used for several more months) was far less than the cost of leasing new cars for the same period from Enterprise.

11. Declarant indeed traveled business class on one occasion to China, but not until the period following his open heart surgery in August of 2009. Prior to that time he traveled by coach on important business trips. However, when he did go to China and to save W2E money, he arranged for his Chinese hosts to pay for all of his accommodations in China – the fact that he made the trip at all demonstrates Declarant's level of professional commitment as he was still recovering from heart

surgery when he returned to Scotland to continue his work on the plant. It was at that time, for those health reasons, that Declarant made the decision to fly business class. Other listed expenses referenced in Item 35 only serve to show ordinary (and not extravagant) business expenses.

12. The single unusual expense for clothing (approximately $1200) referred to by the PC was necessary because Declarant's luggage was lost. Travel expenses by members of Declarant's family were not extravagant and simply replaced the costs that would have been incurred had he returned to the U.S. as often as authorized. Further these expenses were pre-approved by Taylor.

13. The PC attempt is to characterize Declarant as self-aggrandizing, irresponsible and abusive in several paragraphs (Items 33, 34, 35, 36, 39 and 40 of the Emergency Motion). The PC essentially demonstrate nothing more than (i) Declarant is a tough taskmaster and (ii) Declarant went through a personal bankruptcy (Declarant has entered into a settlement agreement with the only remaining creditor in that case and in fact makes monthly payments to him) and Declarant and that creditor agreed to mutually seek a motion to dismiss the bankruptcy which was granted by the judge. Declarant's reputation as a tough taskmaster is a considerable asset to a company that needs top performance from its employees, consultants and contractors – the single example of Declarant's supposed abuse of a prospective customer was that he objected to dealing with the person, who was a government official, due to the government official's late arrival and public drunkenness on a plant tour at Dargavel.

5

14. The references to inconsistent SEC filings (Paragraphs 3 and 42) by W2E since 2009 refer to a period during which, until May 2011, Bohan was Chief Executive Officer. Despite the fact that Bohan filed a declaration in support of the Emergency Motion to have a Trustee appointed, the inconsistent SEC filings were all at a time when Bohan was the W2E's CEO, and responsible for the day to day operation of W2E including all of the SEC filings. Any questions as to inconsistency in SEC filings are clearly Bohan's responsibility and happened on his watch. Prior to Bohan becoming CEO, W2E was always current in its filings.

15. The failure to make timely SEC filings also demonstrates the misguided reliance of Bohan on Waste To Energy Canada, Inc. ("WTEC"), which despite the similarity of name, has no corporate relationship to W2E or any of its subsidiaries. During the period from August 2010 to June 2011 various offers were made by WTEC for the assets of W2E. Declarant believes that an Asset Purchase Agreement as in effect prior to its termination (in accordance with its terms) required a $100,000 payment by WTEC to W2E to provide the necessary funds for W2E to become current in its SEC filings. Declarant believes that no such payment was ever made, but is aware that Bohan continued to deal with WTEC as if they were an entity that complied with its representations and obligations.

16. As Chief Executive Officer for only three months, Declarant has already taken significant steps towards remedying the incomplete and disorganized financial information of W2E resulting from Bohan's tenure as CEO of W2E.

6

Declarant, working with Taylor, caused W2E to employ a new Chief Financial Officer, a position that became vacant during Bohan's tenure.

17. Bohan's incompetence, which led to the appointment of Declarant by Taylor, was affecting the ability of W2E to survive because Bohan's actions, or lack thereof, were actually contrary to W2E's survival. As an example, Bohan caused 1,000,000 shares of W2E's common stock to be issued to a third party that Bohan believed, without doing proper due diligence, was going to acquire W2E. Had Bohan done his due diligence, he would have uncovered the fact that the principals of that company had a past criminal history and would never have been able to complete the acquisition.

18. The funds received from the Debenture Holders ("DH"), including the PC, were raised while Bohan was CEO through a registered broker dealer, Charles Vista Securities ("CV"). CV had agreed to raise $10M in a debenture offering within a 90 day period but the offering took over a year to raise the full amount. The PC were participants in that offering.

19. As a condition of CV undertaking the offering, Declarant believes that Taylor was required to step down as CEO and CV required the Board of Directors to appoint Bohan, who was hand-picked by Greg Lorenzo ("Lorenzo") the head of CV. Declarant believes that Bohan was a valued client of Lorenzo and CV.

20. Of the approximately $10M raised, W2E was only able to utilize approximately $5M for its operations and implementation of its business plan because of the expenses of the offering and the holdback of the first year's interest.

CV retained approximately 18% in fees with 12% interest being held back for the first year's interest with substantial additional funds specifically allocated for legal and accounting fees.

21. Although Declarant had no involvement in the receipt of funds from the DH, Declarant believes that the underlying financial problems of W2E were caused by the failure of CV to complete the debenture offering in a timely fashion as well as Bohan taking direction in his day to day operations of W2E from Lorenzo and not from W2E's Board of Directors.

22. The PC, especially Luppino, Savage and Benkowski, and Bohan have a long history of investing in deals with Lorenzo, many of which are also in distress. The PC represented they were accredited investors and now want to control W2E for their own benefit without any consideration of the intensity and difficulties of running a high-technology, highly-regulated international enterprise.

23. The PC do not have the consent of the other DH who are owed in total approximately three times the amounts owed to the PC but take this action because Declarant believes they do not like new management's approach and it appears they want to go back to the underperforming tenure of Bohan who has spent over two years disparaging Declarant so Bohan could run W2E. Bohan's only accomplishment was to put W2E into the position it now finds itself.

24. The Declarant believes that the PC hold a misplaced confidence in the ability of the Canadian company, WTEC, the unaffiliated company that entered into an Asset Purchase Agreement with W2E. WTEC has attempted to purchase an equity

interest in W2E but, in Declarant's judgment, was unable to consummate a transaction that would benefit W2E. Confirmation of Declarant's belief that WTEC lacks professionalism and integrity may be seen in the Exhibits to the Declaration of Alistar Haughton in support of the PC's Motion. Exhibit D to the Haughton Declaration entitled "License Agreement" has been falsified by carefully whiting-out the heading "DRAFT" on its first page.

25. Declarant, however, believes that his strong personal and professional relationships with (i) the owner of the Scottish company owning the Dargavel plant, Mr. James Hennessey and (ii) Mr. Dong Ping, a Chinese national with substantial access to funds, a facility and a plan for manufacturing "trains" (a critical component of any plant using W2E technology) provide a strong possibility of a successful reorganization of W2E.

26. Declarant, in his three months as CEO, believes from (i) discussions with various parties, (ii) his experience as the former Managing Director of WTEE now in liquidation in Dargavel and (iii) his knowledge as a director of the Isle of Man subsidiaries of W2E (WASTE2ENERGY GROUP HOLDINGS PLC ("W2E Holdings"), WASTE2ENERGY TECHNOLOGIES INTERNATIONAL LIMITED ("W2E Tech"), W2E (IOM) LIMITED and W2E CHINA LIMITED) (together, the "IOM Companies"), that Bohan mislead his employer, W2E, and took actions purportedly on behalf of W2E that he had no authority to do.

27. Declarant states from his personal knowledge that W2E Holdings is the only W2E subsidiary that has a contractual relationship with Ascot

Environmental Ltd. ("Ascot"), owned by Mr. Hennessey – this contract is now in breach due to W2E Holding's failure to timely perform certain requirements of the contract. Nevertheless, Mr. Hennessey's confidence in Declarant had caused him to express his willingness to continue working with Declarant and W2E as set forth in the letter from Ascot dated August 26, 2011, attached as Exhibit A hereto, which confirms Declarant's belief that Mr. Hennessey has no confidence in the management of WTEC or Bohan and has, in fact, denied WTEC management access to the Dargavel plant.

28. In particular, Declarant believes that Bohan promised to WTEC that he could deliver to WTEC all necessary intellectual property to use W2E technology in a plant. Declarant believes that the value of W2E (other than the value of Declarant's personal relationship with Mr. Hennessey and Mr. Dong Ping) consists of certain intellectual property (the "IP") which is necessary for the construction of a functioning W2E plant (several types of plants are possible using the technology -- a description of the products is available on the W2E website (www.waste2energy.com)). This IP is held by a W2E indirect wholly-owned Isle of Man company, W2E Tech (owned directly by W2E Holdings). Declarant believes that the transfer of the IP to W2E Tech occurred in 2008 as part of an effort to protect it from its potential loss due to the Icelandic economic debacle. The IP was far from complete at the time as it was being designed and tested in Scotland at the Ascot waste treatment plant. Certain improvements have been made to the IP since the transfer but it is not, by itself, sufficient to complete a W2E product, i.e.,

additional know-how is necessary to enable a plant to be constructed in locations around the world and to comply with a myriad of local environmental, labor, construction, and technical regulations. Also, the software to automate an installation is incomplete and must be customized for each installation. Nonetheless, management of W2E considers the IP to be a unique and valuable asset.

29. Declarant believes that W2E Holdings has several creditors including professionals, tax authorities and employee claims. Declarant believes these claims are substantial. Ascot also has potential breach of contract claims against W2E Holdings. Messrs. Taylor and Murphy are among the creditors of W2E Holdings. They must act in accordance with IOM law with respect to the liabilities of W2E Holdings. The third director, Mr. Birthisel, is a registered IOM professional director and will have to act in accordance with IOM law with respect to the obligation to place W2E Holdings into insolvency (similar to an English receivership, except virtually no discretion is held by the "receiver" who has the obligation to liquidate all assets as quickly as possible and to pay each creditor their pro rata share) if W2E Holdings is "trading while insolvent," i.e. doing business without a strong probability of fully repaying its creditors.

30. Because Declarant and Mr. Taylor have been working for several months to reach a consensual workout with all of W2E's direct creditors and the creditors of its subsidiaries, Mr. Birthisel has been able to maintain the position that W2E Holdings is not "trading while insolvent" under applicable law.

11

31. Although Mr. Birthisel has a working relationship with the other two directors, Declarant and Mr. Taylor, he has no obligation to them, and, because of their conflict of interest, cannot allow them to control or even participate in this decision.

32. Declarant believes that the only other assets of W2E are a very small amount of cash (approximately $4,000) and the relationships of Declarant with the owner of the single existing plant located in Dargavel, Scotland and the relationship he has with Mr. Dong Ping. The owner of the Dargavel plant is Ascot. The plant is not yet operational but has gone through several test phases. Ascot has developed hundreds of changes to the Dargavel plant, which do not rely on the IP of W2E Tech but are uniquely necessary for compliance with Scottish and European Union regulatory requirements and productive operation. Similar changes would be required for any operational plants in the future, wherever they would be located. Ascot's contractual arrangements are solely with W2E Holdings and he has substantial claims against W2E Holdings for the as yet limited-operational status of Dargavel, which was supposed to be fully operational two years ago.

33. Declarant believes that his statements as to the ownership of the intellectual property (the "IP") of W2E are critical to understanding the knowing misrepresentation by Bohan of his own authority. In particular, attached as Exhibit B, is a document entitled Three-Party Escrow Service Agreement, purportedly signed by WTEC, Iron Mountain and W2E Tech. This escrow agreement was intended as a sign of good faith by W2E in preparation for the consummation of the

acquisition of W2E by WTEC, a transaction that never occurred and the agreement for which expired on its own terms. A copy is attached as Exhibit B. Although the Three-Party Escrow Service Agreement was signed by Mr. Bohan on behalf of the owner of the IP (W2E Tech), Mr. Bohan was never an officer or director of any of the IOM companies including W2E Tech. Declarant believes that Mr. Bohan was very well aware of the fact that he had no such authority as IOM companies are operated very formally and all resolutions for transactions are carefully recorded and voted upon. Declarant further believes that Bohan engaged in this subterfuge to avoid going to the directors of W2E Tech for permission. Declarant was at that time a director of W2E Tech. Declarant would not, and believes that Taylor would not, have approved the entering into of the Three-Party Escrow Service Agreement by W2E Tech.

34. The PC have alleged that Declarant has willfully violated the Three-Party Escrow Agreement by purposefully and wrongfully withholding certain IP from Iron Mountain. Declarant learned of the unauthorized Three-Party Escrow Agreement on August 23, 2011. Declarant remains willing, subject to the local law restrictions on the IOM companies, to give appropriate access to the PC to any and all IP of W2E and its subsidiaries including W2E Tech. Declarant believes that the best source for the location of this IP is Mr. Bohan but is endeavoring to obtain a list from Iron Mountain of the IP that they hold.

35. An assistant of Declarant obtained some further information about the Three-Party Escrow Agreement with Iron Mountain on August 23, 2011. Declarant's

13

assistant spoke with Ms. McDonough of Iron Mountain concerning the above referenced Three-Party Escrow Service Agreement entered into by W2E Tech, WTEC and Iron Mountain Intellectual Property Management, Inc. in November 2010. Declarant understands that Ms. McDonough said that when the Three-Party Escrow Service Agreement was entered into, another document entitled 'Statement of Work' was also executed concerning usability for a level 2 verification test where W2E Tech and WTEC elected to have Iron Mountain as a neutral third party make sure that items received from or on behalf of W2E Tech could be placed into executable code and functional. She had been working with Rod Taylor (purportedly outside counsel for WTEC but not claiming to be an attorney on the WTEC website), to get the 'Statement of Work' invoice paid so that Iron Mountain could perform this test. Declarant understands that Iron Mountain was not willing to perform the testing until that invoice was paid. The amount owed was $15,000 and was due in December, 2010. Declarant has learned that Iron Mountain made several attempts to collect the $15,000 and has now threatened to turn the matter over to a collection agency. Declarant learned of this information from the letter from Iron Mountain to WTEC, a copy of which is attached as Exhibit C.

36. Declarant refers to the Declaration of Alistar Haughton, CEO of WTEC, in support of the Emergency Motion to Appoint a Trustee. Declarant notes that a $5,000 payment to Iron Mountain for simply holding IP in a vault is referred to but there is no reference to the $15,500 payment for actual testing of IP that was

never paid, nor is there a reference to the Three-Party Escrow Service Agreement signed by an obviously unauthorized Mr. Bohan.

37. During the period from the filing by the PC until today, Declarant has undertaken extensive discussions and correspondence with the PC to attempt to demonstrate to them that W2E's chance of survival diminish rapidly without their participation in a consensual reorganization. Declarant has emphasized that opportunities with Ascot and Mr. Dong Ping would be lost by W2E if Declarant were not immediately supported in his efforts to reach a consensual reorganization that shared the IP among WTEC, W2E and the IOM companies. The PC completely rejected Declarant's attempts to negotiate a transaction that included all interested parties. In fact, a proposed Standstill Agreement put forth by the PC expressly forbade Declarant from even speaking to Mr. Hennessey or Mr. Dong Ping.

38. Declarant believes that WTEC's interference in the negotiations with baseless litigation threats and attempts to gain control of W2E for themselves made any sensible and consensual reorganization impossible.

I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, under penalty of perjury, this 8th day of September, 2011.

_____
John Joseph Murphy II